| | |
|---|---|
| KAITLYN TRIMBLE<br>418 Hillview Dr Apt 304<br>Linthicum Heights, MD 21090, *individually and*<br>*on behalf of all others similarly situated,*<br><br><br>      Plaintiff,<br><br>v.<br><br><br>AMERICAN FIRST FINANCE, LLC<br>8585 N. Stemmons Fwy, Suite N-1000<br>Dallas TX 75247<br>**Agent for Service of Process:**<br>CSC-Lawyers Incorporating Service<br>Company<br>7 St. Paul Street, Suite 820<br>Baltimore, MD 21202<br><br>      Defendants. | IN THE CIRCUIT COURT FOR PRINCE<br>GEORGE'S COUNTY<br>                RS<br><br><br><br><br><br>Case No.  C-16-CV-24-001059<br><br><br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

1.      Plaintiff, Kaitlyn Trimble, brings this action to challenge abusive and unlawful consumer leasing, lending, and collection practices which Defendant American First Finance, LLC ("American First") perpetrated against her and a proposed Class and Subclass of similarly situated Maryland consumers, defined below.

2.      Defendant American First Finance, LLC ("American First") is a predatory consumer finance company which does business in Maryland by extending and collecting on high interest consumer loans disguised as rental-purchase agreements. But American First does not comply with Maryland's laws regulating either consumer rental-purchase agreements or loans.

3.      American First is not a typical rent-to-own retailer. It does not have its own store, or any retail location. Indeed, the SEC filings of American First's parent company tout the fact

that American First "does not have any of the costs associated with operating physical retail stores, the personnel needed to operate physical store locations, or any of the costs associated with buying, storing and shipping inventory."

4.      Instead of operating as a traditional rent-to-own retailer, American First contracts with third-party merchants – which it calls "partners" – to provide alternative so-called "payment solutions" for the retailer-partner's customers.

5.      Under American First's scheme in Maryland, its merchant partners – not American First – provide goods and services for American First's customers to purchase.

6.      To finance the purchases, American First's third-party retail partners offer American First's purported rental-purchase "payment solution" as alternative financing. American First's rental-purchase "payment solution" is, in actuality, an extension of credit which includes exorbitant fees and interest rates not allowed under Maryland's lending laws. For example, Plaintiff's financing with American First lasted about five months until she paid off the account in full – and in that time, she paid American First $2,457.87 when the cash price of the merchandise was only $1,779.94. Simple math shows that American First's effective annual interest rate was above 91% - far more than double the allowable rate in Maryland.

7.      American First is a finance company – it finances purchases like Plaintiff's from third-party retail stores and allows consumers like Plaintiff to pay for those purchases over time. In exchange, American First gets paid more than the purchase price. That is the traditional role of a lender. Indeed, American First's registration with the State of Maryland identifies the nature of its business as "financial services."

8.    But Maryland strictly regulates lenders, and American First intentionally endeavors to avoid the application of Maryland's laws regulating lenders in its finance company business.

9.    In order to avoid Maryland's usury laws, American First does not present itself as a traditional small-loan lender. Instead, in the transactions of Plaintiff and Class members, American First used a purported "rental-purchase" form of transaction to disguise what was, in actuality, a loan. Maryland law, however, sees through schemes like American First's:

> Over a century of Maryland precedent establishes that courts must "look[ ] beneath the form of the transaction at issue, into its 'true nature,' in determining whether it was a 'loan.' " *B&S Mktg. Enters., LLC v. Consumer Prot. Div.*, 153 Md. App. 130, 154, 835 A.2d 215 (2003) (citing *Andrews v. Poe*, 30 Md. 485, 487 (1869)). In *Hoffman v. Key Federal Savings & Loan Ass'n*, the Court of Appeals made clear:
> [N]o device or subterfuge of the lender will be permitted to shield him in taking more than the legal interest on a loan. In whatever part of the transaction usury may lurk, or in whatever form it may take, or under whatever guise the lender may attempt to evade the law, the court will seek to ascertain what the contract actually was between the parties and give the debtor relief.
> 286 Md. 28, 34, 416 A.2d 1265 (1979) (quoting *Brenner v. Plitt*, 182 Md. 348, 34 A.2d 853 (1943)).

*Matter of Cash-N-Go, Inc.*, 256 Md. App. 182, 208, 286 A.3d 53, 69 (2022), *cert. denied sub nom. Cash-N-Go, Inc. v. Consumer Prot. Div.*, 483 Md. 275, 291 A.3d 782 (2023).

10.    Here, American First's disguise is transparent – it is a lender. For example, American First has hard-wired into its rental-purchase agreements that consumers "rent" non-personal property charges like "delivery fees" – but there is no way to "rent" (or return) a "delivery fee." In reality, American First is not "renting" a delivery fee, or anything else.

American First is financing consumer purchases of non-personal property items, and imposing interest and other charges on Plaintiff and others which are forbidden by Maryland law.

11.     Furthermore, the true nature of American First's transactions overall – both with respect to personal property and non-personal property items – is lending.

12.     American First's predatory and abusive rental-purchase financing does not comply with Maryland's credit laws – including the Maryland Consumer Loan Law ("MCLL").

13.     And even though American First seeks to disguise its lending transactions as leases, American First did not even comply with the Maryland Rental-Purchase Agreement Act ("MRPAA") in Plaintiff and Class members' transactions.

14.     American First's activities were form-driven and violate the law in materially uniform ways in the transactions of the Plaintiff and the numerous others, and this lawsuit is well-suited for class action treatment.

15.     Accordingly, Plaintiff brings claims on behalf of herself, and a class of similarly situated persons, defined as follows:

> All persons identified as lessees or rental customers in contracts derived from form templates titled "CONSUMER RENTAL-PURCHASE AGREEMENT MARYLAND," where American First Finance, LLC is identified as the lessor.
>
> Excluded from the Class are all persons whose claims are barred by the applicable statute of limitations, all employees or representatives of Defendant, and all Court personnel.

16.     Plaintiff also brings claims on behalf of a subclass of similarly situated persons, defined as follows:

> All Class members whose contract with American First purports to rent non-personal property items including, but not limited to, delivery fees.

4

17.     Excluded from the Class and Subclass are all officers, employees and owners of American First, and all employees of the Court.

## Parties

18.     Plaintiff is a natural person who is a resident and citizen of the State of Maryland.

19.     American First is a limited liability company organized in Delaware, with its principal place of business in Texas.

## Jurisdiction and Venue

20.      This Court has subject-matter jurisdiction over this case pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 1-501 and 4-402(e)(2).  This Court has personal jurisdiction pursuant to Md. Code Ann., Cts. & Jud. Proc. §§ 6-102 and 6-103(b), as American First transacts business and performs work and services in the State of Maryland, contracts to supply services in the State of Maryland, and regularly does and solicits business and engage in other persistent courses of conduct in the State of Maryland, including the business described in this Complaint, which gave rise to the claims asserted in this Complaint.  Furthermore, service of this Complaint will be validly effected upon American First's resident agent in Maryland.

21.     Venue is proper in this Court under Md. Code Ann., Cts. & Jud. Proc. §§ 4-402 and 6-201, as the amount in controversy in this case exceeds $75,000.00 and because American First engages in a regular business and habitually engage in vocation in Prince George's County, Maryland. Among other things, American First directs its activity described in this Complaint to persons including residents of Prince George's County, Maryland, and contracts to perform that business with respect to property located and sold in Prince George's County, Maryland.

American First uses the rental-purchase agreements described in this Complaint to finance purchases kept in Prince George's County by Prince George's County residents, and to finance purchases made in Prince George's County from American First partner stores located in Prince George's County.

## Factual Allegations for Individual and Class Relief

### *American First's Business*

22.    American First is, according to the SEC filings of its parent company, a "leading provider of technology-driven, retail point-of-sale ("POS") payment solutions focused on serving credit-constrained consumers." It is a wholly-owned subsidiary of First Cash Holdings, Inc., a publicly traded company which describes itself as "the leading operator of pawn stores in the U.S. and Latin America."

23.    According to SEC filings, American First "focuses on LTO ["lease to own"] products and facilitating other retail financing payment options across a large network of traditional and e-commerce merchant partners. [American First's] retail partners provide consumer goods and services to their customers and use [American First's] LTO and retail finance solutions to facilitate payments on such transactions."

24.    American First's website calls its products "Bad Credit Financing" and explains "What Qualifies as "Bad Credit" Financing? … A: Bad credit financing refers to providing a consumer with payment options or financing even with a poor credit score."

25.    Through American First's "lease-purchase" or "rental-purchase" financing, Plaintiff and members of the Class financed the acquisition of merchandise and services from merchants and, in turn, made payments back to American First.

26.     Although American First marketed its financing in Plaintiff's and Class members' transactions as part of "rental purchase" or "rent to own" transactions, the description of the transaction as involving a rental was a disguise. In actuality, American First extended credit to Plaintiff and each Class member.

**American First Extended Credit to Plaintiff and Class Members by Financing Non-Personal Property Items Which Cannot Be Rented or Returned**

27.     For example, in American First's transactions the amounts financed by the rental-purchase contracts for Plaintiff and each Subclass member included non-personal property which could not possibly be rented or returned – only purchased.

28.     In Plaintiff's transaction, for example, American First rolled a "delivery fee" into the "Total Cash Price" it financed in Plaintiff's rental-purchase contract. A "delivery fee" cannot be rented, and it cannot be returned, and it is not personal property – so it cannot be part of a rental purchase agreement under Maryland law. For example, the MRPAA defines ""Rental property" as "***personal property*** that is the subject of a rental-purchase agreement." MRPAA § 12-1101 (emphasis added). Non-personal property charges, like delivery fees, are not rental property under Maryland law and cannot be rented under the MRPAA.

29.     Yet by the time the default two-year term of American First's rental-purchase contract with Plaintiff was up, American First would have received more than $600 in payments from Plaintiff in exchange for somehow "renting" a $209.99 delivery fee to her for monthly payments over two years. Plaintiff paid her contract off early, but still paid more than $280 to American First on account of its extension of credit to her for the $209.99 delivery fee, over approximately five months.

30.     American First did not, in fact, "rent" the delivery fee to Plaintiff. Instead, American First financed the delivery fee to Plaintiff at an interest rate far in excess of Maryland's usury rate.

31.     American First paid the delivery fee in Plaintiff's transaction to its third-party merchant partner, extended credit to Plaintiff for the amount of the delivery fee and allowed Plaintiff to pay back the delivery fee over time in exchange for collecting additional "leasing fees" attributable to the delivery fee. The "leasing fees" which American First collected from Plaintiff, including the leasing fees attributable to Plaintiff's delivery fee, constituted interest.

32.     American First has engaged in materially the same practice with numerous other Maryland residents who are Class members. For Plaintiff and each Class member, American First extended credit to Plaintiff and Class members for the delivery fee, paid the delivery fee to a third-party on Plaintiff and Class members' behalf, and in exchange accepted payments over time to repay American First, with interest, for the amount American First paid to the third party. American First regularly extends credit to Maryland consumers for non-personal property charges as part of its so-called rental purchase transactions.

33.     Similarly, American First rolled the $199.99 cost of a five year "extended warranty" into the cash price for Plaintiff's transaction – but such a warranty is not "personal property" and cannot be part of a rental-purchase agreement under Maryland law. American First did not, in fact, "rent" the extended warranty to Plaintiff. Instead, American First financed the Plaintiff's purchase of the extended warranty at an interest rate far in excess of Maryland's usury rate. Plaintiff paid American First more than $270 over approximately five months on account of its extension of credit to her for her purchase of the $199.99 extended warranty.

34.     Each time American First purported to "rent" non-personal property items to Plaintiff and Subclass members, American First in fact made a loan at an interest rate in excess of Maryland's usury limit.

35.     American First's practice of financing non-personal property through its rental-purchase contracts is no accident. American First has hard-wired the practice into its form agreements. Each of American First's form agreements with Plaintiff and Class members includes a space dedicated to including a "delivery fee" as part of the "total cash price" financed by the agreement.

36.     American First's extensions of credit to Plaintiff and Subclass members included extensions of credit for non-personal property items which cannot ever legally be financed through rental-purchase agreements in Maryland. For example, through her weekly payments to American First over the course of roughly five months, Plaintiff paid more than $280 to American First allocable to, and in exchange for, American First's advance payment of $209.99 to a third party for a non-personal property "delivery fee," which American First purportedly "rented" to her as part of her contract. Similarly, Plaintiff paid more than $270 to American First allocable to, and in exchange for, American First's advance payment of a $199.99 to a third-party for a non-personal property "extended warranty." Each Subclass member had a similar experience.

37.     American First's payment of $209.99 to a third party for a "delivery fee" at the time of Plaintiff's transaction, in exchange for Plaintiff's payments over five months totaling more than $280 for the $209.99 charge, constituted an extension of credit under Maryland law.

38.     American First's payment of $199.99 to a third party for an "extended warranty" at the time of Plaintiff's transaction, in exchange for Plaintiff's payments over five months totaling more than $270 for the $199.99 charge, constituted an extension of credit under Maryland law.

39.     American First extended credit to Plaintiff and other Subclass members for non-personal property items at a rate of interest more than double the enforceable rate. For example, in Plaintiff's transaction, the default term of the rental-purchase agreement carried an effective interest rate of 166% per year - it called for weekly payments by Plaintiff, for 104 weeks, totaling $6,764.12, when the "cash price" stated in the contract was only $1,779.94. Plaintiff paid her contract off early, but she still paid a total of $2,457.87 over less than 5 months – resulting in an effective interest rate of more than seven percent *per month*, or 91% per year. Plaintiff paid an interest rate of 91% per annum to American First on the non-personal property items financed in her contract with American First. By contrast, the maximum enforceable rate for a consumer loan in Maryland is 33%, under the Maryland Consumer Loan Law ("MCLL"), Md. Code Ann., Com. Law § 12-306.

40.     American First's practice of financing non-personal property through its rental-purchase agreements with Plaintiff and Subclass members in return for payments over time with an effective interest rate in excess of the enforceable rate constitutes usury, and violates Maryland law, including the Maryland Consumer Loan Law ("MCLL"), Md. Code Ann., Com. Law §§ 12-303.

**American First Extended Credit to Plaintiff and Class Members by Financing Purchases in Rental Purchase Agreements Which Were Designed to Function as Loans and to Evade Maryland's Usury Laws**

41.     Furthermore, looking beneath the surface of American First's transactions with Plaintiff and Class members and the nominal "rental-purchase" nature of those transactions shows that the *entire* transactions – not just the portion of the transactions that involved financing of non-personal property items – were thinly disguised loan transactions.

42.     American First targets consumers with limited access to traditional forms of credit for its "rental-purchase" financing.

43.     American Finance's "rental-purchase" agreements have a default payment schedule, under which the consumer pays more than three times the cash price of the financed merchandise or service.

44.     American First extended credit to Plaintiff and each Class member at an effective rate of interest more than the enforceable rate. For example, in Plaintiff's transaction, the default term of the rental-purchase agreement carried an interest rate of 166% per year - it called for weekly payments by Plaintiff, for 104 weeks, totaling $6,764.12, when the "cash price" stated in the contract was only $1,779.94. Plaintiff paid her contract off early, but she still paid a total of $2,457.87 over less than 5 months – resulting in an effective interest rate of more than seven percent *per month*, or 91% per year. By contrast, the maximum enforceable rate for a consumer loan in Maryland is 33%, under the Maryland Consumer Loan Law ("MCLL"), Md. Code Ann., Com. Law § 12-306.

45.     Although American First purportedly "rents" items to consumers, it advertises to its investors that it has no need to store inventory. American First does not intend or expect

11

consumers to ever return the items they are purportedly renting. Instead, it expects consumers to keep the items financed in their rental-purchase agreements, and intentionally endeavors to prevent consumers from returning to American First the items that American First is purportedly "renting."

46.     For example, the terms of American First's rental-purchase agreements do not state that Plaintiff and Class members may terminate the rental-purchase agreement without penalty by voluntarily surrendering or returning the rental property in good repair, normal wear and tear excepted, upon expiration of any rental term and payment of any past due rental payments – a requirement for rental-purchase agreements under Maryland law. *See* Md. Code Ann., Com. Law § 12-1104(a)(12). Instead, American First's rental purchase agreements with Plaintiff and Class members indicate that they can return the property only upon payment of the "Cost of Lease Services" – a sum totaling more than twice the cash value of the rental property.

47.     Furthermore, if consumers fall behind on payments, then the terms of the rental-purchase agreements prevent consumers from terminating their future payment obligations—effectively locking them into the default schedule requiring them to pay several times the cash value of the financed merchandise even if they want to return or surrender their financed merchandise.

48.     In addition, American First's contracts with Plaintiff and Class members provide no information about how or where consumers can return their merchandise. Instead, when customers contact American First requesting to return merchandise they are purportedly renting, American First does not take the merchandise back – like a true lessor would. Instead, American First instructs its agents to tell customers to give the merchandise to a charity.

12

49.    For example, one complaint about American First submitted to the federal

Consumer Financial Protection Bureau ("CFPB"), dated November 4, 2022, states as follows:

> I got appliances on a rent to own agreement. I was told I could cancel the agreement anytime after initial lease term which was two months. I have been paying {$120.00} a week auto payments for 8 months and was told I still owe over $ XXXX for appliances that cost {$3500.00}. I called the company and they told me I can't terminate lease I can only donate appliances to charity for tax write off and still owe balance. I have never heard of this before. I want to either have company come and get appliances or credit money I have paid for appliances to balance which would pay off items.This was supposed to be a lease to own meaning I can cancel items without purchase.

50.    Another complaint about American First submitted to the CFPB, dated May 20,

2022, states as follows:

> In XX/XX/XXXX of XXXX I found furniture on XXXX XXXX and financing was offered through American First Finance. The total cost of the purchase came out to {$2500.00}. There were to be bi-weekly payments of {$200.00}. On XX/XX/XXXX I contacted XXXX XXXX and asked if they would take the furniture back after seeing that the payoff doubled. The company stated that they would not accept returns. I called American First Finance. I spoke to a representative that stated if the store would not accept the return of furniture. She gave me the option of donating it to a not for profit charity and uploading a form with the charities tax ID info on it. I stated that I didn't have a truck to take the furniture to the said charity and asked if XXXX XXXX would do the pick up. She stated they would not. On XX/XX/XXXX, I called to have a payment deferred since I can not afford to continue to pay on this predatory loan. They rep stated that they could not do a deferrerment and offered to cancel the payment scheduled on XX/XX/XXXX. The payment still pulled out on XX/XX/XXXX and I called to see why. I asked for the payment to be refunded as I requested a deferment. The representative placed me on hold and asked when I could make up the payment. I again requested that the payment be refunded and stated that I would like a deferment. The representative explained that the XXXX collection system pulled from my card. This is predatory lending and I would like to return this furniture immediately.

51.    Another complaint about American First submitted to the CFPB, dated January

20, 2021, states as follows:

American First Finance company is scaming people out of money for payments. They charged me XXXX in leasing services and fees on top of the XXXX i owed on the furniture. I made a total of XXXX in payments on the furniture that i took out which are : bed XXXX mattress XXXX box spring XXXX dinette set XXXX dresser/mirror XXXX chest XXXX sectional and ottoman XXXX night statnd XXXX mattress protector- XXXX I sent back the sofa, dinette, dressor/mirror ( to a charity of choice which they said do and keep the reciept and send to them ). I sent them the reciept and they are still saying i owe XXXX. I have read severl reviews on this company and they are doing that to everyone. i have called the company on more than one occasion and they cant tell me what XXXX in leasing fees and serivces comes from or how they break it down " its just something the computer generates ".

52.     And, a complaint about American First submitted to the Better Business Bureau

("BBB"), dated August 2, 2023 states:

"I was approved for $1500 and lost my job. I was told that my lease to own purse went from $1500 to $3800!!! I am now was suppose to pay until December **** from January 2021!!! Now they have placed it in collections at the almost $4000 amount!!! How can they do that to a person! That is triple the amount and I could donate it to charity but I would still owe the money!!! I am sooo freaking ****** off ?? I have no words and it has lowered my credit score terribly and affected my employment chances. I explained and was willing to provide my layoff notice but it was a no and we dont care attitude with the supervisor. American First Finance is a scammer and should be out of business."

53.     Another complaint about American First submitted to the BBB states as follows:

High Finance Charges, Unable To ******************** To Return Merchandise, I Opened The Account In June ***** 7 Months Of AutoPay Totaling Over $3000 , I Was Shocked To See Early Pay Out Of Over $6000 Left On This Account, But On ********** Credit Score Account It Has A Balance Of $2009 Remaining, I Feel defrauded. And I Want To Return The Merchandise

54.     Another complaint about American First submitted to the BBB, dated August 30,

2022, states as follows:

This company is so full of it! Went to American Freight store and was told one price biweekly and soon as it was time to start making payments, this company

took out triple the amount. Called and spoke to someone and I told them that it is not what the store employee told me my bill would be! Told them I could not afford that amount biweekly and to cancel all future transactions and refund my money! Told them that they can come pick up they merchandise and they told me they couldn't get it back that I had to donate it to charity! BULL ****!! I will see how fast they would come get it once they see they are not getting paid! Then they turn around and sent a email and the bottom of the email clearly stated that you can terminate your contract at any time AND RETURN MERCHANDISE BACK TO THE STORE!! I would NEVER use this company again and advise people to please be careful when dealing with this company!!

55.    Another complaint about American First submitted to the BBB, dated August 22, 2022, states as follows:

Please be aware of this company!!!! DO NOT FINANCE ANY THING FROM THIS COMPANY!!!! I bought furniture from American Freight in Sept. I was told to pay off a certain amount by January and I wouldn't accrue any fees, like an early buy out option. No one said of, the bill will be tripled if you don't. Well Jan came. I looked at my balance and the interest fees were 3x more than the actual bed set. Original bed set with mattress was about $1,500. They are saying I now owe about $7,000 due to not paying off by January. The furniture was still in the box. So of course no one wanted me to return it. They told me to call the furniture store. Furniture store said to call American First back. This is ridiculous. I told them they are scammers and this over the top interest rate has to be against the law. They are doing business like a loan shark.They are frauders. DO NOT finance any thing involving this company!!!!

56.    Another complaint about American First submitted to the BBB, dated July 30, 2022, states as follows:

Account Number: X-XXXXXXX-X

In Jan of 2022, I leased/purchased a small, low quality; 3 seater couch, 2 floor model end tables, 1 floor model coffee table and insurance, totaling about $1,100 . By April of 2022, that total ballooned to almost $3,000. Total Paid from Jan 5, 2022 to July, 19 - ($1066.96)

As discussed with the store manager prior to signing the contract, I contacted the store to end my lease and requested a pick-up. I was then informed that I needed to contact American First Finance directly and so I did.

Since April, American First Finance has been vague with regards to the return process. When requesting an email or a link detailing the process, I am directed to contact the 800 number.
On their website, there is no indication that in order to end the lease a customer is to donate the items to a charitable foundation and then submit documentation from that foundation.

After being lied to and confused since the beginning, I found it difficult to believe that I could simply get out of this awful loan/lease by giving the furniture away to a charity. I am still confused!
The furniture has been donated to the Salvation Army, I have submitted the proof and I am hoping I did the right thing. I have read some complaints where customers have donated the merchandise but the account remained open while American First Finance still attempts to collect.

I'd like American Finance to acknowledge my return, end my contract and remove their
entries from my credit report going back to April. This company is horrible.. How is this legal?

57.    Another complaint about American First submitted to the BBB, dated June 7,

2021, states as follows:

PLEASE READ THESE REVIEWS AND BELIEVE THEM. They are one of the worst companies I have ever had to deal with. I was not warned about paying off my item IN TOTAL BY 100 Of THE PURCHASE DATE. so after the 100 days they added a 7000$ leasing fee to my item that I had already been making payments on for months. Turned a 3000$ purchase into a 11000 one. And know they want me to donate it because they don't accept returns.

58.    Another complaint to the BBB about American First, dated November 17, 2023,

states as follows:

I purchased a phone on 11/15/23 from Broadway wireless. American first finance financed the phone for me. I lost my job on 11/16/23. Within 24 hours I went back to the store to attempt to return it. The store refused to accept the return. I contacted the leasing company, and they refused to accept the return. When I explained to the leasing company I received an email on 11/16/23 saying if the store doesn't accept the return you can call and start the return process with

them. The customer service representative stated it can be donated. I explained I seen nothing about donating the property in the contract or in any emails that was sent. I attached a copy of the email that was sent with this information.

59.     Another complaint to the BBB about American First, dated December 2, 2023,

states as follows:

In June 2023 I financed a bedroom set & TV stand at American Freight for $1690. They offer financing through American First Financial. The store advised me of an early payoff offer for $1900 that will expire in September 2023. I had every intention of accepting the early payment offer but I became unemployed in September 2023. I called American Finance to advise I was no longer employed as well as to inquire about assistance since I was unemployed. They also advised I was behind on the monthly payment of $267.70. 1 told them I could no longer afford that payment amount and if they will work with me in an alternative. The representatives from the company advised they cannot change or lower payment until my account was current or I can take out a loan for $2585.82 to payoff the account. I also advised that in May 2023 I filed Chapter 7 and will not qualify for loan approval. The representative told me to ask family for the money. I told the representative that my mother is 83 years old and she lives on a limited income and cannot afford to help with the payoff amount. They also recommend that I return the furniture to my local store American Freight. The store does not take furniture back. Even if American Freight accepted the furniture or have it donated to Goodwill I would still be responsible for paying off the account balance. A representative today told me that I've paid $1100 of the $1690 original balance but I still owe all of these unreal fee amounts. He also advised I cannot get any help until I pay off the remaining past due balance of $267.70. I explained the I'm employed now but took a $4.00 per hour pay cut just to have a job & rent take my 1st complete payment of the month. The 2nd check goes to my car note and utilities. The only thing they do is predatory lending and unfair/unethical business practices. All I want to do is have my monthly payments lowered so I afford to make payments.

60.     Not only does American First direct its agents to tell its customers that they cannot

return to American First the merchandise they are purportedly renting from American First

without penalty, but American First also intentionally directs its agents to tell consumers that they

must pay off their rental purchase agreements without mentioning any right or option for

consumers to return the items they are purportedly renting without penalty. Inconsistent with the terms of a true lease, but consistent with the terms of a loan, American First instructs its servicing agents to tell consumers that they must complete a certain number of payments in order to purchase the merchandise and terminate their contracts.

61.    For example, American First's employee or agent told Plaintiff on or about December 6, 2023, that "The payoff amount as of the date of this message is $985.47," that "If a payment is not made today to pay off the account within the discounted period, the leasing fees on the account will no longer be discounted and the payoff balance will be increased," that "if the account is not paid off today for the discounted balance of $985.47, you will be required to continue to make the weekly frequency payments of $70.97 up to the maturity date of 07/11/2025 to pay off the total cost of the loan which is an estimated $7,380.88," and, that "The only other option is that when the discounted period ends, we can have a settlement offer calculated for you which would be valid for 30 days. All payments made after the settlement is calculated will be going toward the offer provided to you. Once the settlement is paid, the account will be closed as 'settled'."

62.    American First treats its transactions with Plaintiff and Class members like loan transactions with respect to credit reporting. American First, for example, reported to the credit bureaus that Plantiff had a balance of $7,380 on the subject account – when the cash price of what was purportedly rented was only $1,779.94. American First's reporting that Plaintiff had a debt of $7,380, the total amount of payments to purchase the items "rented," showed that it treated the transaction not as a lease of merchandise which could be returned, but as an

extension of credit to finance Plaintiff's purchase from a third-party. American First similarly reported to the credit bureaus the accounts of other Class members.

63.    American First also treats its rental-purchase transactions like loans with respect to the account statements for Plaintiff and Class members. American First's account statements for Plaintiff and Class members characterize the "cash price" of the items they are "renting" as the "Ending Balance" on their account – just like a loan would characterize that amount as the principal due on the loan. For example, on the day Plaintiff opened her account with American First, American First's account statement reflects that she had an "Ending Balance" of $1,779.94 – the same as the cash purchase price of the merchandise financed by the account. But if Plaintiff was truly renting from American First, she would have no such debt when she began her first rental period. Instead, her actual debt would at most be the currently due rental payment.

64.    Furthermore, American First's account statements include columns showing "Rent Paid" as well as "Leasing Fees" – and American First applied only a small fraction of Plaintiff and each Class member's full rent payments to the "Rent Paid" column in the statements. American First applied the lion's share of each payment to the "Leasing Fees" column. In this way, American First's "rental purchase" transactions were accounted to consumers like high-interest consumer loans, where a small part of each payment goes to pay principal, and most of the payment goes to pay interest. If American First's accounts were true leases, then its account statements would reflect that all of each rental payment goes to "Rent Paid."

65.    Each time Plaintiff or Class members made a payment, American First's account statements showed that their "Ending Balance" was reduced by only a fraction of their payment,

and that most of their payments were used up by "leasing fees." American First's so-called

"leasing fees" were, in the transactions of Plaintiff and Class members, disguised interest.

66.     In Plaintiff's transaction, for example, American First provided Plaintiff an

account statement which applied approximately 24.1% of each of her payments to "rent paid,"

and a whopping 61.6% of each payment to purported "leasing fees."

67.     Furthermore, on the date that Plaintiff opened her account with American First,

American First's account statement shows that her "Early Buyout/Purchase Price" on that date

was *more* than the cash price. Specifically, American First's account statement identified the

"Early Buyout/Purchase Price" on July 14, 2023, as $1,938.68. American First's account

statements for Plaintiff and Class members applied the full amount of each payment to the "Early

Buyout/Purchase Price," but only a fraction of each payment to the "Ending Balance."

68.     Thus, the account statements for Plaintiff and Class members gave the impression

that even if the Plaintiff or Class member did not pay for an "early buyout," they still had a

substantial balance remaining on their account to be paid, and that balance (which started out as

the cash price of the items they were "renting") only decreased by a fraction of each payment

made. Yet if the transactions of Plaintiff and Class members were true leases, their accounts

would have no balance except for any currently due or past due rental payments.

69.     American First's illegal, abusive, deceptive and unfair conduct pervaded virtually

every step of the Plaintiff and Class members' experiences, not only in contracting and servicing

(as described above) but also in its advertising.

70.     In terms of advertising, American First aggressively markets its financing to cash-

strapped consumers through advertisements that treat American First's transaction as traditional

financing and obscure the consumer's right to terminate the leases. For example, an advertisement for American First's rental-purchase scheme posted on the website of American Freight – where Plaintiff obtained the merchandise she financed with American First – discusses the terms of an American First lease in detail but fails to mention any right of the consumer to return the merchandise or terminate the lease without penalty. It describes an American First lease as follows:

> An example of your **Lease** payment for a 12-month term with weekly payments: if you leased a $1,000 couch and made a $50 (plus tax) initial payment or processing fee, you would have 52 additional weekly payments of $46.11. Your total lease payments would be $2,452.21 with full, timely payments over 12 months. Late fees, insufficient funds fee, and Liability Damage Waiver fees may also be included where permitted. You may be required to make an initial leasing payment or processing fee of $50 (plus tax) when you execute your lease. The total number of lease payments is based on your agreement and pay frequency.

71.     Under the lease advertised on American Freight's website and quoted above, a consumer pays $2,452.21 over 12 months for a $1,000 couch – an interest rate of ***more than 245%***.

72.     Another advertisement, on a website provided by American First for American Freight customers who seek to "apply now" for a "personalized payment plan," similarly discusses the terms of an American Freight lease in detail but fails to mention any right of the consumer to return the merchandise or terminate the lease without penalty. It states:

> **Leases:** A lease, lease-to-own or rent-to-own program, or rental-purchase agreement has a processing fee or initial rent payment due upon execution of the lease of $50 plus tax. The Total Cost of Ownership must be paid in order to obtain ownership. The lessee will not own the property until the total amount necessary to acquire ownership is paid either by payment of the total of payments over the full term of the agreement or by prepayment as provided for by law.

Acquiring ownership by leasing costs more than the retailer's cash price. The total number of lease payments necessary to obtain ownership of the property ranges from 1 to 104 payments, depending on your agreement and payment frequency. The timing of scheduled payments may be weekly, bi-weekly, semi-monthly, or monthly depending on when you are paid. As an example, the Total Cost of Ownership for a couch that costs $1,000 could be $2,174.72, including the $1,000 cash price, plus applicable tax and fees (e.g., leasing fees, processing fee or initial rental payment, and delivery fees). In this example, after the initial $50 payment plus tax, 52 full, timely payments of $40.86 plus sales tax per week over 12 months may be required for ownership. Late fees, NSF fees, and Liability Damage Waiver (LDW) fees may apply where permitted.

73.     And, a webpage provided by American First titled "Rent-to-Own Leases," explains how American First's rental-purchase contracts work: "Instead of paying for the product all at once, **you 'rent' the product until the contract is fully paid off**." (emphasis added). This webpage also discusses American First's leases in detail but fails to mention any right to return merchandise without penalty.

74.     Another example of American First's advertising describes how its rental-purchase "payment solution" works: "American First Finance has purchased the merchandise and will lease it to you, charging you rental payments in accordance with your agreement. While you take the merchandise home, we own the merchandise until you purchase it from us by exercising one of three options: 1. The Early Buyout Option; 2. The Early Purchase Option; 3. Pay over the entire term of the agreement." Once again, conspicuously absent from the three "options" American First identifies is the option to return the merchandise without penalty – an option essential to a true lease.

75.     As discussed above, American First rarely if ever actually accepts true returns of the merchandise "leased" from it. Instead, American First's business model is built on the

22

expectation that its customers cannot and will not return merchandise without penalty under its lease-to-own contracts.

76.    In sum, American First's transactions in Maryland with Plaintiff and Class members were not true rental-purchase transactions. Instead, they were disguised usurious loan transactions.

## American First Violated the MCLL by Making Consumer Loans to Plaintiff and Class Members Without an MCLL License

77.    When American First made loans to Plaintiff and Class members as described above, it did not have the license required by Maryland law.

78.    Plaintiff's and each Class member's transaction involved a loan or advance of money or credit of less than $25,000.00, which is subject to the MCLL. In fact, all of its loans to Plaintiff and Class Members are for less than $25,000.00. American First makes numerous such loans to Marylanders each year.

79.    American First is a traditional lender in the business of making loans to consumers and is engaged in the lending industry. American First extends credit and makes loans to numerous consumers every year. Making consumer loans is American First's primary business. Each time American First enters into a rental purchase agreement with a Maryland consumer, American First extends credit to the consumer. For example, SEC filings reflect that American First markets to merchants through channels including "strategic integrations via waterfall lending platforms," that American First's "payment solutions business competes with … other types of consumer finance companies that may enable customers to shop at traditional or online retailers on credit," and that American First employs "proprietary…loan-management software."

The same SEC filing states that "If the Company were to lose any of its licenses to conduct its business, it could result in the temporary or permanent closure of stores and/or cessation of [American First's] consumer lending activities, any of which could adversely affect the Company's business, results of operations and cash flows." Furthermore, American First advertises that its "specialties" include "Consumer Credit," "Lending," "Consumer Loans," and "Consumer Lending."

80.     American First advertises that "American First Finance is a leading payment solution provider that offers a wide range of financial products, including bad credit loans."

81.     American First does not have a license to make consumer loans in Maryland under the MCLL, as required under MCLL § 12-302. American First made consumer loans to Plaintiff and each Class member without an MCLL license.

82.     None of the loans of Plaintiff or Class Members contain a written election to be governed by Subtitle 1, Subtitle 4, Subtitle 9, or Subtitle 10 of the Maryland Commercial Law Article. As a result, the MCLL applies to Plaintiff and Class members' transactions with American First.

83.     American First was not permitted to make loans to Plaintiff or Class Members because it is not, and never has been, licensed under or exempt from the licensing requirements under the MCLL.

84.     American First's loans to Plaintiff and each Class Member are void and unenforceable because American First made the loans without a license under the MCLL, when American First is not exempt from the licensing requirements of the MCLL.

85.     American First has unlawfully received and retained, and continues to receive and retain, principal, interest, fees, and other compensation with respect to its loans to Plaintiff and Class Members, which are void and unenforceable under the MCLL. American First has no right to collect or retain any amounts from Plaintiff and Class members with respect to the extensions of credit which are the subject of this lawsuit.

86.     American First is not, and has never been, licensed as required by Maryland law, the statutes requiring American First to be licensed are regulatory in nature for the protection of the public, rather than merely to raise revenue, and American First's actions described in this Complaint violate the fundamental public policy of Maryland.

### American First Violated the Per Se Requirements of the Maryland Rental Purchase Agreement Act in Plaintiff and Class Members' Transactions

87.     Although American First characterized its transactions with Plaintiff and Class members as rental-purchase transactions, American First did not comply with the MRPAA in those transactions.

88.     For example, the MRPAA requires every rental purchase contract to contain "(i) A statement of the cash price of the rental property; or (ii) If a single rental-purchase agreement involves a lease of 2 or more items of rental property as a set, a statement of the aggregate cash price of all items. MRPAA § 12-1104(a)(4). "Rental property," under the MRPAA, includes only "personal property," and does not include non-personal property charges such as delivery fees. American First's contracts with Plaintiff and Subclass members do not state the aggregate "cash price" of all items of "rental property," as required by the MRPAA. Instead, American First's contract with Plaintiff and Subclass members include an aggregate cash price which includes

non-"rental property" items, such as non-personal property delivery fee charges. By failing to disclose in the rental purchase agreements with Plaintiff and Subclass members the aggregate cash price of the rental property, American First violated the MRPAA.

89.    In addition, American First's "Summary of Costs Chart" disclosures, required by the MRPAA, similarly failed to state the aggregate "cash price" of all items of personal property involved in the rental purchase agreement as required by the MRPAA, because Maryland law requires the aggregate statement of "cash price" to include only the price of personal property, but American First's aggregate "cash price" statements in its contracts with Plaintiff and Subclass members each included non-personal property items, such as delivery fees.

90.    American First also failed to include the "delivery fee" for Plaintiff and Subclass members in the total initial payment statement in its contracts, as required under MRPAA § 12-1111, but instead rolled that delivery fee into the "cash price" so that the delivery fee accrued substantial additional "leasing charges" – i.e. unlawful and usurious interest on the delivery fee – billed to Plaintiff and Subclass members which would not have occurred if the delivery fee had been included in the initial payment as required by the MRPAA.

91.    Moreover, American First's rental-purchase agreement does not state that Plaintiff and Class members can return the merchandise covered by the rental purchase agreement "without penalty," as required by MRPAA § 12-1104(a)(12).

92.    Furthermore, American First failed to use the forms and make the disclosures required by the MRPAA §§ 12-1103, 12-1104, and 12-1111.

93.    American First also failed to state the "Total Weekly Rental Payment" or "Total Monthly Rental Payment" as prescribed by MRPAA § 12-1111, but instead used a confusing

chart to identify a number of inapplicable potential payments so that the Plaintiff's and Class members' actual payment obligations were unclear, frustrating the MRPAA's mandate to use simple disclosures in a particular form.

94.     Additionally, American First's contracts with Plaintiff and Class members did not include a disclosure, required by MRPAA, as follows: "No Ownership Until Total Paid: You will not acquire ownership of the rental property until you pay the total rental payments necessary to acquire ownership, or unless you exercise an early purchase option."

95.     American First's contracts with Plaintiff and Class members did not include the disclosure, in the form required by the MRPAA, as follows: "Termination: You (lessee) may terminate this agreement without penalty at the end of any weekly or monthly term by returning the rental property to us in good condition. You will be liable for any unpaid rental payments due upon the date of return." Instead, American First's contracts with Plaintiff and Class members require payment of "past due" amounts and "liability under Section 6" of the rental purchase agreement before the so-called "rental" payments can be avoided on a going-forward basis. And, the liability identified in Section 6 of the rental purchase agreement is the "total cost of lease services" – i.e. the difference between the cash price and the total that would be paid if all weekly payments are made for the full term of the contract. In Plaintiff's transaction, for example, the liability listed in Section 6 was $4,984.18. So until all past-due payments are made, and until the "total cost of lease services" is paid, the customer cannot avoid additional monthly payments by returning the merchandise, under American First's contract language.

96.     American First also violated the MRPAA in Plaintiff and Class members' transactions by including an onerous "Indemnification" provision in each of those contracts, a

term which purported to waive Plaintiff and Class members' claims and defenses against American First.

### *Plaintiff's Experiences*

97.    Plaintiff received a loan from American First in the amount of less than $25,000.00, for consumer, family and household purposes, when American First did not have a license to make such a loan under Maryland law and when American First was not exempt from the licensing requirements of Maryland law.

98.    American First markets itself as a "partner" to American Freight, a big-box retailer of furniture, mattresses and appliances with more than 370 U.S. locations in 40 states.

99.    In July, 2023, Plaintiff shopped at an American Freight store for furniture, and selected multiple items of personal property to purchase, including a bed foundation, mattress, mattress protectors, storage drawers, headboard and footboard, and rail.

100.    American First, through its partnership with American Freight, offered to finance Plaintiff's purchases using a "rental-purchase agreement."

101.    Plaintiff did not understand that the transaction offered was a rental-purchase transaction. She was led to believe that the transaction was a no-interest payment plan for purchasing the merchandise. The documents for the transaction were provided to Plaintiff via DocuSign E-mails to her phone, which made the terms of the documents extremely difficult to meaningfully review at the point of purchase.

102.    The rental-purchase agreement in Plaintiff's transaction stated a "Total Cash Price" of $1779.94.

103.    The "Total Cash Price" stated in American First's rental purchase contract for Plaintiff's transaction included non-personal property items. For example, American First included a $209.99 "delivery fee" into the "Total Cash Price" it financed in Plaintiff's rental-purchase contract. The "delivery fee" financed in Plaintiff's rental-purchase contract was not personal property or rental property. American First paid the delivery fee on Plaintiff's behalf, in exchange for Plaintiff's payments over time to American First of more than the delivery fee. Over roughly five months of payments on her account with American First, Plaintiff paid more than $280 to American First due to the $209.99 in credit American First extended to her to pay the delivery fee.

104.    Similarly, American First included the $199.99 cost of a non-personal property five year "extended warranty" into the "Total Cash Price" stated in the rental purchase contract for Plaintiff's transaction. Over roughly five months of payments, Plaintiff paid more than $270 to American First on account of the $199.99 in credit American First extended to her to pay for the extended warranty.

105.    When American First purported to "rent" non-personal property items to Plaintiff, like the delivery fee and extended warranty charge, and collected payments for those non-personal property items over time, American First in fact made and collected loans to Plaintiff at interest rates far in excess of Maryland's usury limit.

106.    American First reported Plaintiff's purported "rental" account to the credit bureaus and drove down her credit score if she did not make payments on the account. Indeed, American First reported to credit bureaus that Plaintiff owed American First a "balance" of $7,380 – an amount that corresponded to the maximum total weekly payments contemplated by

the rental-purchase agreement over two years and which, under the terms of the rental purchase contract, would result in Plaintiff obtaining ownership of the financed merchandise. American First did so as part of an intentional effort to treat Plaintiff's account not as a week-to-week rental, but as a loan obligation. American First reported to credit bureaus that Plaintiff owed it a balance of $7,380 at the inception of her account because American First treated Plaintiff's account not as a weekly rental, but as a loan.

107.    Furthermore, American First's adhesion contract with Plaintiff includes an automatic "Payment Authorization," which authorizes American First to automatically withdraw from Plaintiff's payment account "every payment provided in this Agreement, unless you otherwise direct us in writing." Under that contract language, unless Plaintiff took some affirmative action, American First was authorized to withdraw 104 weekly payments for two years, until all possible weekly payments were made, the items financed under the rental-purchase agreement had been purchased by Plaintiff under the rental-purchase agreement terms, and Plaintiff had paid more than $7,380 for a "cash price" of $1,779.94. By including these automatic Payment Authorization terms in its form contract, American First again treated the transaction as a two-year term loan; not a weekly rental agreement. Although Plaintiff repeatedly attempted to withdraw the automatic Payment Authorization, American First repeatedly withdrew amounts from her payment account after Plaintiff attempted to withdraw the authorization.

108.    Plaintiff did not understand at the time she signed the rental purchase contract that the contract authorized American First to automatically take more than $7,000 from her for her purchases of less than $2,000. Instead, several months into the term of Plaintiff's rental-

purchase agreement, American First told Plaintiff that if she did not make an "early payoff," she would be required to pay more than $7,000, which shocked the Plaintiff. At that time, American First told Plaintiff "if the account is not paid off today for the discounted balance of $985.47, you will be required to continue to make the weekly frequency payments of $70.97 up to the maturity date of 07/11/2025 to pay off the total cost of the loan which is an estimated $7,380.88."

109.    In order to avoid paying the more than $7,000 American First told her she would have to pay if she did not make an early payoff, Plaintiff got help from her mother to make the early payoff. In total, Plaintiff paid American First $2,457.87 on purchases totaling $1,779.94, over roughly five months.

110.    As a result of her transaction with American First, Plaintiff's credit report has been seriously adversely affected, even though American First claimed the transaction was a rental and not a credit transaction.

111.    Through payments to American First over the course of roughly five months, from July 14, 2023 though December 18, 2023, Plaintiff paid more than $280 to American First allocable to, and in exchange for, American First's advance payment of $209.99 to a third party for a non-personal property "delivery fee," which American First purportedly "rented" to her as part of her contract. Similarly, Plaintiff paid more than $270 to American First allocable to, and in exchange for, American First's advance payment of a $199.99 to a third-party for a non-personal property "extended warranty."

112.    American First's payment of $209.99 to a third party for a "delivery fee" at the time of Plaintiff's transaction, in exchange for Plaintiff's payments over five months totaling more than $280 for the $209.99 charge, constituted an extension of credit under Maryland law.

113.    American First's payment of $199.99 to a third party for an "extended warranty" at the time of Plaintiff's transaction, in exchange for Plaintiff's payments over five months totaling more than $270 for the $199.99 charge, constituted an extension of credit under Maryland law.

114.    American First's extension of credit to Plaintiff was at a rate of interest more than double the enforceable rate. For example, in Plaintiff's transaction, the default term of the rental-purchase agreement carried an effective interest rate of more than 150% per year - it called for weekly payments by Plaintiff, for 104 weeks, totaling $7,380, when the "cash price" stated in the contract was only $1,779.94. Plaintiff paid her contract off early, but she still paid a total of $2,457.87 over less than 5 months – resulting in an effective interest rate of more than seven percent *per month*, or more than 91% per year. Plaintiff paid an effective interest rate of 91% per annum to American First on the non-personal property items financed in her contract with American First, as well as on the personal property items.

115.    In contrast with American First's effective interest rate of more than 91% per annum in Plaintiff's transaction, the maximum enforceable rate for a consumer loan in Maryland is 33%, under the MCLL § 12-306.

116.    American First was not licensed under the MCLL to extend any loan to Plaintiff. American First's loan to Plaintiff is and was void *ab initio* and unenforceable under the MCLL.

117.    Over the course of approximately five months, Plaintiff paid more than $2,450 to American First because of American First's demands that she pay it every week for its illegal and unenforceable loan to her. Plaintiff suffered actual damages in the form of all of the payments she made to American First which she did not owe, and she is entitled to recover all amounts of principal, interest, and fees she paid toward American First's illegal loan, under the MCLL.

118.    Furthermore, American First violated the MRPAA in multiple respects in Plaintiff's transaction. For example, Plaintiff's contract with Plaintiff failed to state the aggregate "cash price" of all items of personal property involved in the rental purchase agreement as required by the MRPAA, because Maryland law requires the aggregate statement of "cash price" to includes only the price of personal property, but American First's aggregate "cash price" statements in its contracts with Plaintiff included non-personal property items.

119.    In addition, American First's "Summary of Costs Chart" disclosures in Plaintiff's transaction, required by the MRPAA, similarly failed to state the aggregate "cash price" of all items of personal property involved in the rental purchase agreement as required by the MRPAA, because Maryland law requires the aggregate statement of "cash price" to include only the price of personal property, but American First's aggregate "cash price" statements in its contracts with Plaintiff included non-personal property items.

120.    American First also failed to include the "delivery fee" for Plaintiff in the total initial payment statement in its contract, as required under MRPAA § 12-1111, but instead rolled that delivery fee into the "cash price" so that the delivery fee accrued substantial additional "leasing charges" – i.e. unlawful and usurious interest on the delivery fee – billed to Plaintiff which would not have occurred if the delivery fee had been included in the initial payment as required by the MRPAA.

121.    Moreover, American First's rental-purchase agreement does not state that Plaintiff can return the merchandise covered by the rental purchase agreement "without penalty," as required by MRPAA § 12-1104(a)(12).

122.    Furthermore, American First failed to use the forms and make the disclosures required by the MRPAA §§ 12-1103, 12-1104, and 12-1111 in Plaintiff's transaction.

123.    American First also failed to state the "Total Weekly Rental Payment" or "Total Monthly Rental Payment" as prescribed by MRPAA § 12-1111 in Plaintiff's transaction, but instead used a confusing chart to identify a number of inapplicable potential payments so that the Plaintiff's actual payment obligations were unclear, frustrating the MRPAA's mandate to use simple disclosures in a particular form.

124.    Additionally, American First's contract with Plaintiff failed to include a disclosure, required by MRPAA, as follows: "No Ownership Until Total Paid: You will not acquire ownership of the rental property until you pay the total rental payments necessary to acquire ownership, or unless you exercise an early purchase option."

125.    American First's contract with Plaintiff failed to include the disclosure, in the form required by the MRPAA, as follows: "Termination: You (lessee) may terminate this agreement without penalty at the end of any weekly or monthly term by returning the rental property to us in good condition. You will be liable for any unpaid rental payments due upon the date of return."

126.    Instead, American First's contract with Plaintiff required payment of "past due" amounts before the so-called "rental" payments could be avoided on a going-forward basis. So, until all past-due payments were made, Plaintiff could not avoid additional monthly payments by returning the merchandise, under American First's contract language.

127.     American First also violated the MRPAA in Plaintiff's transaction by including an onerous "Indemnification" provision in her contract, which purported to waive claims and defenses against American First.

128.     Plaintiff suffered actual damages as a result of American First's violations of the MRPAA when she paid "leasing fees" to American First attributable to the non-personal property items, which were financed in her rental purchase agreement in violation of the MRPAA.

129.     Plaintiff is entitled to statutory damages of no less than $500 under the MRPAA due to American First's violations of the statute in her transaction.

### *Class Action Allegations*

130.     The Class and Subclass, as defined above, is identifiable.  The Plaintiff is a member of the Class and Subclass. The Class and Subclass are each so numerous that joinder of all members is impracticable. The Class includes no fewer than 40 persons.

131.     There are questions of law and fact which are not only common to the members of the Class and Subclass, but which predominate over any questions affecting only individual Class members.  The common and predominating questions include, but are not limited to:

> A.     Whether American First's nominally rental-purchase transactions were, in fact, loan transactions in whole or in part;

> B.     Whether American First was required to be licensed under the MCLL before engaging in its transactions with Plaintiff and Class Members;

C.    Whether American First's transactions with Plaintiff and Class

Members void and unenforceable under the MCLL;

D.    Whether Plaintiff and each Class member are entitled to recover

all payments made to American First under the MCLL;

E.    Whether American First's transactions violated the MRPAA; and,

F.    Whether Plaintiff and Class members are entitled to recover

damages under the MRPAA.

132.    Plaintiff's claims are typical of the claims of the respective members of the Class

and Subclass within the meaning of Md. Rule 2-231(b)(3) and are based on and arise out of

similar facts constituting the wrongful conduct of Defendant.

133.    Plaintiff will fairly and adequately protect the interests of the Class and Subclass

within the meaning of Md. Rule 2-231(b)(4).  Plaintiff is committed to vigorously litigating this

matter.  Further, Plaintiff has secured counsel experienced in handling consumer class actions

and complex consumer litigation.

134.    Neither Plaintiff nor Plaintiff's counsel has any interests which might cause them

not to vigorously pursue this claim.

135.    The prosecution of separate actions by individual members of the Class and

Subclass would create a risk of establishing incompatible standards of conduct for Defendants

within the meaning of Md. Rule 2-231(c)(1)(A).

136.    Defendant's actions are generally applicable to the respective Class and Subclass

as a whole, within the meaning of Md. Rule 2-231(c)(2).

137.    Common questions of law and fact enumerated above predominate over questions affecting only individual members of the Class and Subclass and a class action is the superior method for fair and efficient adjudication of the controversy within the meaning of Md. Rule 2-231(c)(3).

138.    The likelihood that individual members of the Class will prosecute separate actions is remote due to the time and expense necessary to conduct such litigation.

139.    Plaintiff's counsel are experienced in class actions, and foresee little difficulty in the management of this case as a class action.

## Causes of Action

### COUNT I.        Violation of the MCLL

140.    Plaintiff re-alleges and incorporates by reference the allegations set forth above.

141.    Each of the loans to Plaintiff and Class members which are the subject of this Complaint were for less than $25,000, are extensions of credit or loans subject to the MCLL and are "loans" under the MCLL.

142.    American First made the loans to Plaintiff and Class members which are the subject of this Complaint, and is a "lender" under the MCLL.

143.    Each of American First's transactions with Plaintiff and Class members was a loan transaction under the MCLL. In each transaction of Plaintiff and Class members, American First advanced money or credit to Plaintiff and each Class member by financing Plaintiff and each Class member's purchases from a third-party retailer, in exchange for payments from Plaintiff and each Class member to American First in an amount greatly exceeding the cash price of those purchases.

144.    In addition, in each transaction of Plaintiff and Subclass members, American First advanced money or credit to Plaintiff and each Subclass member by financing Plaintiff and each Subclass member's purchase of non-personal property items, including but not limited to delivery fees and extended warranties, in exchange for payments from Plaintiff and each Subclass member to American First in an amount greatly exceeding the cash price of those purchases.

145.    None of the loans to Plaintiff or Class Members elect to be governed by Subtitle 1, Subtitle 4, Subtitle 9, or Subtitle 10 of Title 12 of the Maryland Commercial Law Article.

146.    American First made loans to Plaintiff and Class members of less than $25,000 when American First was required to be licensed under MCLL § 12-302, but American First was not and never has been licensed under or exempt from the licensing requirements of the MCLL.

147.    The loans to Plaintiff and Class members are and always were void and unenforceable under the MCLL.

148.    American First is not and was never entitled to receive or retain any principal, interest, fees, or other compensation with respect to any loan to Plaintiff or Class members, and its loans to Plaintiff and Class members are void and unenforceable under the MCLL.

149.    In violation of the MCLL, American First, with respect to the Plaintiff's and Class members' loans that are and always were void and unenforceable, collected and attempted to collect, directly or indirectly, amounts from Plaintiffs and Class members.

150.    Because American First acted as a lender without an MCLL license in the transactions of Plaintiff and Class members, American First must return to Plaintiff and all Class members "all amounts" collected on each loan. *Price v. Murdy*, 462 Md. 145, 157, 198 A.3d 798, 805 (2018).

### COUNT II.　　　　Violation of the MRPAA

151.　Plaintiff re-alleges and incorporates by reference the allegations set forth above as if fully set forth herein.

152.　American First's contracts with Plaintiff and Subclass members failed to state the aggregate "cash price" of all items of personal property involved in the rental purchase agreement as required by the MRPAA, because Maryland law requires the aggregate statement of "cash price" to includes only the price of personal property, but American First's aggregate "cash price" statements in its contracts with Plaintiff and Subclass members each included non-personal property items.

153.　In addition, American First's "Summary of Costs Chart" disclosures in its transactions with Plaintiff and Subclass members similarly failed to state the aggregate "cash price" of all items of personal property involved in the rental purchase agreement as required by the MRPAA. Maryland law requires the aggregate statement of "cash price" to include only the price of personal property, but American First's aggregate "cash price" statements in its contracts with Plaintiff and Subclass members each included non-personal property items.

154.　American First also failed to include the "delivery fee" for Plaintiff and Subclass members in the total initial payment statement in its contracts with them, as required under MRPAA § 12-1111, but instead rolled that delivery fee into the "cash price" so that the delivery fee accrued substantial additional "leasing charges" – i.e. unlawful and usurious interest on the delivery fee – billed to Plaintiff and Subclass members which would not have occurred if the delivery fee had been included in the initial payment as required by the MRPAA.

155.    Moreover, American First's rental-purchase agreement does not state that Plaintiff and Class members can return the merchandise covered by the rental purchase agreement "without penalty," as required by MRPAA § 12-1104(a)(12).

156.    Furthermore, American First failed to use the forms and make the disclosures required by the MRPAA §§ 12-1103, 12-1104, and 12-1111.

157.    American First also failed to state the "Total Weekly Rental Payment" or "Total Monthly Rental Payment" as prescribed by MRPAA § 12-1111, but instead used a confusing chart to identify a number of inapplicable potential payments so that the Plaintiff's and Class members' actual payment obligations were unclear, frustrating the MRPAA's mandate to use simple disclosures in a particular form.

158.    Additionally, American First's contracts with Plaintiff and Class members failed to include a disclosure, required by MRPAA, as follows: "No Ownership Until Total Paid: You will not acquire ownership of the rental property until you pay the total rental payments necessary to acquire ownership, or unless you exercise an early purchase option."

159.    American First's contracts with Plaintiff and Class members failed to include the disclosure, in the form required by the MRPAA, as follows: "Termination: You (lessee) may terminate this agreement without penalty at the end of any weekly or monthly term by returning the rental property to us in good condition. You will be liable for any unpaid rental payments due upon the date of return."

160.    Instead, American First's contracts with Plaintiff and Class members require payment of "past due" amounts before the so-called "rental" payments can be avoided on a going-forward basis. So until all past-due payments are made, the customer cannot avoid

40

additional monthly payments by returning the merchandise, under American First's contract language.

161.    American First also violated the MRPAA in Plaintiff and Class members' transactions by including an onerous "Indemnification" provision in those contracts, purporting to waive Plaintiff and Class members' claims and defenses against American First.

162.    Plaintiff and each Class member are entitled to actual damages and statutory damages as a result of American First's violations of the MRPAA.

WHEREFORE, Plaintiff demands judgment against American First in an aggregated amount for the Plaintiff and Class as a whole in excess of $75,000.00, including:

A.    Payment to Plaintiff and Class Members of the damages imposed by the licensing provisions of the MCLL, including a return to Plaintiff and Class Members of all payments made by Plaintiff and each Class member on their accounts with American First, and including a return of all payments made by Plaintiff and Subclass members toward non-personal property items financed in their accounts with American First;

B.    Payment to Plaintiff and Class members of the damages imposed by the MRPAA § 12-1110(b);

C.    Compensatory damages in an amount determined by a jury;

D.    Pre-judgment and post-judgment interest at the legal rate on all sums awarded to Plaintiff and Class Members; and,

E.      Such other and further relief as the nature of this case may require.

Respectfully submitted,

_____
Benjamin H. Carney (CPF No. 0412140132)
bcarney@GWCfirm.com
Richard S. Gordon (CPF No. 8912180227)
rgordon@GWCfirm.com
GORDON, WOLF & CARNEY, CHTD.
11350 McCormick Road, Executive Plaza 1
Suite 1000, Hunt Valley, Maryland 21031
Telephone: (410) 825-2300
Facsimile: (410) 825-0066

Attorneys for Plaintiff and the Class

**JURY TRIAL**

Plaintiff demands a trial by jury on all issues triable of right by a jury.

_____
Benjamin H. Carney