**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| KAITLYN TRIMBLE, *individually, and on behalf of all others similarly situated*,<br><br>                    Plaintiff,<br><br>v.<br><br>AMERICAN FIRST FINANCE, LLC,<br><br>                    Defendant. | Case No. 1:24-cv-00969-RDB |

**Plaintiff's Opposition to Defendant's Motion to Compel Arbitration and to Dismiss**

Benjamin H. Carney
Richard S. Gordon
GORDON, WOLF & CARNEY, Chtd.
Executive Plaza 1, Suite 1000
Hunt Valley, Maryland 21031
Tel. (410) 825-2300
Fax. (410) 825-0066
bcarney@GWCfirm.com
rgordon@GWCfirm.com

Attorneys for Plaintiff

# Table of Contents

I.    INTRODUCTION ................................................................. 1

II.   FACTS ............................................................................. 3

    A.   AMERICAN FIRST'S UNLAWFUL LENDING SCHEME ................................ 3

    B.   AMERICAN FIRST'S ARBITRATION MOTION ........................................ 5

III.  LEGAL STANDARDS ........................................................ 7

    A.   ARBITRATION CANNOT BE COMPELLED IN THE ABSENCE OF A BINDING
ARBITRATION OR DELEGATION AGREEMENT .................................. 7

    B.   THERE IS NO PRESUMPTION IN FAVOR OF THE EXISTENCE OF AN
ARBITRATION AGREEMENT – AMERICAN FIRST BEARS THE BURDEN HERE ........... 7

    C.   THE ALLEGATIONS OF THE COMPLAINT ARE TAKEN AS TRUE ................... 8

IV.   ARGUMENT ..................................................................... 9

    A.   THE COURT – NOT AN ARBITRATOR – MUST DECIDE PLAINTIFF'S
CHALLENGE THAT THE ARBITRATION AND DELEGATION "AGREEMENTS" ARE
ILLUSORY ....................................................................... 9

        1.   *A Specific Challenge to the Formation of an Arbitration Agreement Is For a Court, Not
an Arbitrator, to Decide*.................................................................... 9

        2.   *Whether the Purported Arbitration and Delegation Agreements Are Illusory Is a Question
of Contract Formation*..................................................................... 11

    B.   IF ONE PARTY CAN UNILATERALLY EXEMPT THEMSELVES FROM
ARBITRATION, AN ARBITRATION "AGREEMENT" IS ILLUSORY ..........................12

    C.   AMERICAN FIRST'S CHANGE CLAUSE MAKES THE PURPORTED ARBITRATION
AND DELEGATION "AGREEMENTS" ILLUSORY ...............................................13

        1.   *The Change Clause Applies to the Arbitration and Delegation Agreements* ............... 13

        2.   *The Change Clause Gives American First the Unfettered Right to Unilaterally Change
Any Promise to Arbitrate* ................................................................. 15

        3.   *No Notice Requirement Saves the Illusory "Agreements"*......................................... 19

        4.   *The Change Clause Does Not Include any Restriction on Retroactive Modifications*... 20

        5.   *The Change Clause Makes the Arbitration Provisions Illusory, Whether or Not It Was
Used* ....................................................................................... 21

6.      *The Agreement Cannot Be Rewritten to Provide Consideration* ................................ 22

7.      *Any Ambiguity in Contract Language Is Resolved Against Arbitration* ...................... 22

8.      *Implied Covenants, Estoppel, and Severance Cannot Save the Arbitration and Delegation "Agreements."* ............................................................................................................ 23

9.      *This Court and Many Others Have Repeatedly Refused to Compel Arbitration in Similar Circumstances* ................................................................................................... 27

**V.      CONCLUSION** ........................................................................................ **30**

## Cases

*Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355 (4th Cir. 2012) ...........................................8

*Am. Gen. Life & Acc. Ins. Co. v. Wood*, 429 F.3d 83 (4th Cir. 2005)..................................21

*Arnold v. Homeaway, Inc.*, 890 F.3d 546 (5th Cir. 2018)..................................................11

*Bailey v. Mercury Fin., LLC*, --- F. Supp. 3d ---, No. CV DKC 23-827, 2023
WL 6244591 (D. Md. Sept. 26, 2023) .....................................................................2, 28

*Baker v. Bristol Care, Inc.*, 450 S.W.3d 770 (Mo. 2014) ...................................................21

*Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*, 822 F. Supp. 2d 505 (D. Md.
2011) .................................................................................................................25

*Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225 (4th Cir. 2019) ..............................9

*Bindagraphics, Inc. v. Fox Grp., Inc.*, 377 F. Supp. 3d 565 (D. Md. 2019).........................24

*Brent v. Priority 1 Auto. Grp., BMW of Rockville*, No. PWG-14-1705, 2016 WL
9724975 (D. Md. Aug. 4, 2016)...............................................................................30

*Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582 (D. Md. 2013)....................30

*Canales v. Univ. of Phoenix, Inc.*, 854 F.Supp.2d 119 (D.Me.2012) ..................................30

*Canaras v. Lift Truck Servs., Inc.*, 322 A.2d 866 (Md. 1974) .............................................22

*Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202 (5th Cir. 2012).....................................20

*Cheek v. United Healthcare of Mid-Atl., Inc.*, 835 A.2d 656 (Md. 2003)...................2, 11, 12, 21, 22, 24

*Cherdak v. ACT*, 437 F. Supp. 3d 442 (D.Md. 2020).......................................................15

*Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288 (4th Cir. 2022) ...........................2, 8, 11, 12, 18

*Coinbase, Inc. v. Suski*, 144 S. Ct. 1186 (2024)...........................................................7, 10

*Convergence Mgmt. Assocs., Inc. v. Callender*, No. CV TDC-15-4015, 2016 WL
6662253 (D. Md. Nov. 10, 2016).............................................................................8

*Cox v. Time Warner Cable, Inc.*, 2013 WL 5469992 (D.S.C. Sept. 30, 2013)....................11

*Davis v. Joseph J. Magnolia, Inc.*, 640 F. Supp. 2d 38 (D.D.C. 2009)................................30

*Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213 (1985) ...............................................7

*Devine v. Bethesda Softworks, LLC*, 636 F. Supp. 3d 564 (D. Md. 2022) ................................................6

*Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017) ............................................9, 14, 26

*DIRECTV, Inc. v. Mattingly*, 829 A.2d 626 (Md. 2003) .................................................................19

*Dumais v. Am. Golf Corp.*, 299 F.3d 1216 (10th Cir. 2002)......................................................18, 22, 23

*Enfield Equip. Co. v. John Deere Co.*, 64 F. Supp. 2d 483 (D. Md. 1999) ...........................................24

*Esser v. Anheuser-Busch, LLC*, 567 S.W.3d 644 (Mo. Ct. App. 2018) ...............................................30

*Ford v. Genesis Fin. Sols., Inc.*, --- F. Supp. 3d ---, No. CV DLB-23-2156, 2024 WL 1340356 (D. Md. Mar. 28, 2024) ............................................................................................2, 27

*G & M Oil Co. v. Glenfed Fin. Corp.*, 782 F. Supp. 1078 (D. Md. 1989)..........................................24

*Gibbs v. Haynes Invs., LLC*, 967 F.3d 332 (4th Cir. 2020) ........................................................9, 15

*Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286 (4th Cir. 2020) ..................................................9

*Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287 (2010) ...........................................................8

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 575 F. Supp. 2d 696 (D. Md. 2008) ....................................................................................................................................19

*Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th Cir. 2016)......................................................9, 14, 26

*Holloman v. Cir. City Stores, Inc.*, 894 A.2d 547 (Md. 2006) ...............................................18, 21, 23

*In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195 (10th Cir. 2016)......................................................................................................................11

*In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058 (D. Nev. 2012)......................................................................................................................................30

*Jean v. Bucknell Univ.*, 2021 WL 1521724 (M.D. Pa. Apr. 16, 2021) ...........................................30

*Johnson v. Cont'l Fin. Co., LLC*, --- F. Supp. 3d ---, No. 8:22-CV-02001-PX, 2023 WL 5804281 (D. Md. Sept. 7, 2023) ...............................................................................................2, 28

*Jones v. Prosper Marketplace, Inc.*, No. GJH-21-1126, 2022 WL 834210 (D. Md. Mar. 21, 2022) ......................................................................................2, 14, 15, 21, 23, 29

*Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704 (10th Cir. 2011) ......................................................................................................................................26

*Loc. Union No. 637, Int'l Bhd. of Elec. Workers, AFL-CIO v. Davis H. Elliot Co.*, 13 F.3d 129 (4th Cir. 1993) ...........................................................................................................7

*Macke Laundry Serv. Ltd. P'ship v. Alleco Inc.*, 743 F. Supp. 382 (D. Md. 1989) ................................22

*Mey v. DIRECTV, LLC*, 971 F.3d 284 (4th Cir. 2020).......................................................................8

*Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449 (4th Cir. 2017)..............................................................................................8

*Morgan v. Sundance, Inc.*, 142 S. Ct. 1708 (2022)..........................................................................7

*Morrison v. Amway Corp.*, 517 F.3d 248 (5th Cir. 2008) ..............................................................20

*Moses H. Cone Memorial Hospital v. Mercury Const.*, 460 U.S. 1 (1983)........................................7

*Mould v. NJG Food Serv. Inc.*, 986 F. Supp. 2d 674 (D. Md. 2013) .............................................15

*Mowbray v. Zumot*, 536 F. Supp. 2d 617 (D. Md. 2008).................................................................26

*MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386 (3d Cir. 2020)...............................................................................................................7

*Nat'l Cmty. Reinvestment Coal. v. Consumer Fin. Prot. Bureau*, No. CV 20-2074 (BAH), 2022 WL 4447293 (D.D.C. Sept. 23, 2022).....................................................................16

*Nat'l Fed'n of the Blind v. The Container Store, Inc.*, 904 F.3d 70 (1st Cir. 2018) ...........11, 23

*Novic v. Credit One Bank, Nat'l Ass'n*, 757 F. App'x 263 (4th Cir. 2019) .............................................6

*Philadelphia Indem. Ins. Co. v. Markel Ins. Co.*, No. CV RDB-20-0669, 2021 WL 2434409 (D. Md. June 14, 2021) .................................................................................................15

*Piano v. Premier Distrib. Co.*, 107 P.3d 11 (N.M. 2004).....................................................2, 17, 22, 26

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967) ...................................................7

*Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651 (Md. 2009) ........................................19, 25

*Raley v. Whitestake Improvements LLC*, No. CV DLB-22-194, 2022 WL 3975189 (D. Md. Sept. 1, 2022) .......................................................................................................30

*Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63 (2010) ...............................................................6, 7, 10

*Rouse Co. v. Fed. Ins. Co.*, 991 F. Supp. 460 (D. Md. 1998) .............................................................23

*Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253 (4th Cir. 2021) ................................................................................................................................................8

*Savostianov v. Fed. Advocs., Inc.*, No. CV 20-1711 (CKK), 2021 WL 1026018 (D.D.C. Mar. 17, 2021) ...........................................................................................................30

*Shelnutt v. Mayor*, 776 S.E.2d 650 (Ga. App. 2015) ..........................................................................16

*Simpson v. Synergenx Health Kingwood LLC*, 2021 WL 765410 (S.D. Tex. Feb. 25, 2021) ..........................................................................................................................................30

*Stamatiades v. Merit Music Serv., Inc.*, 124 A.2d 829 (Md. 1956) ......................................................25

*Torres v. S.G.E. Mgmt., LLC*, 397 Fed.Appx. 63 (5th Cir.2010).........................................................20

*Walton v. Mariner Health of Maryland, Inc.*, 894 A.2d 584 (Md. 2006) .............................................15

*Watkins v. Carr*, No. CV PX-17-0819, 2018 WL 10741730 (D. Md. Jan. 12, 2018) .......................................................................................................................................................10

*Weckesser v. Knight Enterprises S.E., LLC*, 735 F. App'x 816 (4th Cir. 2018).....................................25

*Wheeler v. Plano Arbor Hills LLC*, 2020 WL 6781609 (E.D. Tex. Nov. 18, 2020) .............................................................................................................................................................30

*Windesheim v. Verizon Network Integration Corp.*, 212 F. Supp. 2d 456 (D. Md. 2002) ..........................................................................................................................................................11

*Zamora v. Swift Transp. Corp.*, 547 F. Supp. 2d 699 (W.D. Tex. 2008) ............................................30

## **Statutes**

9 U.S.C. §1 ...........................................................................................................................................9

## **Other Authorities**

Black's Law Dictionary (10th ed.2014) ...............................................................................................16

Merriam–Webster's Online Dictionary ..............................................................................................16

Oxford Advance Learner's Dictionary ................................................................................................16

## **Rules**

Fed. R. Civ. P. 12 .................................................................................................................................8

Plaintiff, Kaitlyn Trimble ("Plaintiff"), opposes the Motion to Compel Arbitration and to Dismiss (the "Motion") (ECF#15) and memorandum in support (the "Memo") (ECF#16) filed by Defendant, American First Finance, LLC ("American First").

## I.     Introduction

This lawsuit challenges American First's predatory lending scheme, which targets vulnerable Maryland consumers. American First does business in Maryland by extending and collecting on high interest consumer loans disguised as rental-purchase agreements. In Plaintiff's transaction, for example, American First charged her an effective interest rate of more than 91% to "rent" the payment of money, among other things. "Renting" money is lending, and American First's lending practices in Maryland include the collection of more than double the allowable interest rate from Plaintiff and numerous others, at considerable cost and loss to those consumers.

Yet American First does not concern itself with complying with Maryland law because it believes that it is protected from any challenge and can freely operate outside the law. That is because American First includes purported arbitration "agreements" in its contracts. Where companies can force arbitration, they are virtually guaranteed to win and can block class action litigation challenging their practices. *See* **Exhibit 1**, CFPB Factsheet, Arbitration Study (companies win in arbitration more than 90% of the time, and arbitration is used "by design … to block class actions in court.").

But American First was not satisfied with only the near certainty of prevailing in an arbitration against its customers. Instead, it wanted maximum flexibility. It therefore also included a *unilateral change-in-terms clause* and retained the express right to *change* the arbitration agreement, with *no restrictions* on its ability to modify its obligations except that the modifications must be "in writing." *See* ECF No. 16-3 at ¶ 21 ("You understand that no changes may be made to this Agreement ***except by [American First] in writing***.") (emphasis added) (the "Change Clause").

1

In this way, American First sought to avoid any risk of ever being required to face a challenge in arbitration. If Plaintiff filed for arbitration, American First could use the Change Clause to unilaterally change the agreement so that arbitration is not allowed.

Unfortunately for American First, however, its plan in Maryland fails as a matter of law because American First's arbitration agreement is illusory and lacks consideration. *See, e.g., Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 292 (4th Cir. 2022) (unilateral change-in-terms provision renders arbitration agreement without consideration and illusory) (*citing Cheek v. United Healthcare of Mid-Atl., Inc.*, 835 A.2d 656, 662 (Md. 2003)); *Piano v. Premier Distrib. Co.*, 107 P.3d 11, 15 (N.M. 2004) (virtually identical change-in-terms clause made arbitration agreement illusory).

No fewer than four Judges on this Court have concluded that arbitration agreements are illusory in similar circumstances. *See Ford v. Genesis Fin. Sols., Inc.*, --- F. Supp. 3d ---, No. CV DLB-23-2156, 2024 WL 1340356, at *1 (D. Md. Mar. 28, 2024) (arbitration agreement was illusory where similar lender included unilateral change-in-terms provision in consumer finance contract which also contained arbitration and delegation provisions); *Bailey v. Mercury Fin., LLC*, --- F. Supp. 3d ---, No. CV DKC 23-827, 2023 WL 6244591 (D. Md. Sept. 26, 2023) (same); *Johnson v. Cont'l Fin. Co., LLC*, --- F. Supp. 3d ---, No. 8:22-CV-02001-PX, 2023 WL 5804281 (D. Md. Sept. 7, 2023) (same); *Jones v. Prosper Marketplace, Inc.*, No. GJH-21-1126, 2022 WL 834210, at *15 (D. Md. Mar. 21, 2022) (same).

As discussed below, the conclusion of these cases is equally applicable here -- American First never made any promise to arbitrate. Instead, it reserved the unilateral right to *change* any arbitration "agreement." That means that no arbitration agreement was formed or legally exists. The Court should deny the Motion.

## II.    Facts

### A. American First's Unlawful Lending Scheme

American First is a predatory consumer finance company which does business in Maryland by extending and collecting on high interest consumer loans disguised as rental-purchase agreements. Complaint ¶ 1.  But American First does not comply with Maryland's laws regulating either consumer rental-purchase agreements or loans. *Id.*

American First is not a typical rent-to-own retailer. *Id.* ¶ 2. It does not have its own store, or any retail location. *Id.* Indeed, American First's parent company touts the fact that American First "does not have any of the costs associated with operating physical retail stores, the personnel needed to operate physical store locations, or any of the costs associated with buying, storing and shipping inventory." *Id.*

Instead of operating as a traditional rent-to-own retailer, American First contracts with third-party merchants – which it calls "partners" – to provide alternative so-called "payment solutions" for the retailer-partner's customers. *Id.* ¶ 4

Under American First's scheme in Maryland, its merchant partners – not American First – provide goods and services for American First's customers to purchase. *Id.* ¶ 5.

To finance the purchases, American First's third-party retail partners offer American First's purported rental-purchase "payment solution" as alternative financing. *Id.* ¶ 6. American First's rental-purchase "payment solution" is, in actuality, an extension of credit which includes exorbitant fees and interest rates not allowed under Maryland's lending laws. *Id.* For example, Plaintiff's financing with American First lasted about five months until she paid off the account in full – and in that time, she paid American First $2,457.87 when the cash price of the merchandise was only $1,779.94. *Id.* Simple math shows that American First's effective annual interest rate was above 91% - far more than double the allowable rate in Maryland. *Id.*

American First is a finance company – it finances purchases like Plaintiff's from third-party retail stores and allows consumers like Plaintiff to pay for those purchases over time. *Id.* ¶ 7. In exchange, American First gets paid more than the purchase price. *Id.* That is the traditional role of a lender. *Id.* Indeed, American First's registration with the State of Maryland identifies the nature of its business as "financial services." *Id.*

But Maryland strictly regulates lenders, and American First intentionally endeavors to avoid the application of Maryland's laws regulating lenders in its finance company business. *Id.* ¶ 8. In order to avoid Maryland's usury laws, American First does not present itself as a traditional small-loan lender. *Id.* ¶ 9. Instead, in the transactions of Plaintiff and Class members, American First uses a purported "rental-purchase" form of transaction to disguise what is, in fact, a loan. *Id.* Maryland law, however, sees through schemes like American First's:

> Over a century of Maryland precedent establishes that courts must "look[ ] beneath the form of the transaction at issue, into its 'true nature,' in determining whether it was a 'loan.' " …
>
>> [N]o device or subterfuge of the lender will be permitted to shield him in taking more than the legal interest on a loan. In whatever part of the transaction usury may lurk, or in whatever form it may take, or under whatever guise the lender may attempt to evade the law, the court will seek to ascertain what the contract actually was between the parties and give the debtor relief.

*Matter of Cash-N-Go, Inc.*, 256 Md. App. 182, 208, 286 A.3d 53, 69 (2022), *cert. denied sub nom. Cash-N-Go, Inc. v. Consumer Prot. Div.*, 483 Md. 275, 291 A.3d 782 (2023) (citations omitted).

Here, American First's disguise is transparent – it is a lender. Complaint ¶ 10. For example, American First has hard-wired into its rental-purchase agreements that consumers "rent" non-personal property charges like "delivery fees" – but there is no way to "rent" (or return) a "delivery fee." *Id.* In reality, American First is not "renting" a delivery fee, or anything else. *Id.* American First is financing consumer purchases of non-personal property items, and imposing interest and

other charges on Plaintiff and others which are forbidden by Maryland law. *Id.* Furthermore, the true nature of American First's transactions overall – both with respect to personal property and non-personal property items – is lending. *Id.* ¶ 11.

American First's predatory and abusive rental-purchase financing does not comply with Maryland's credit laws – including the Maryland Consumer Loan Law ("MCLL"). *Id.* ¶¶ 12, 77-86. And even though American First seeks to disguise its lending transactions as leases, American First does not even comply with the Maryland Rental-Purchase Agreement Act ("MRPAA") in Plaintiff and Class members' transactions. *Id.* ¶¶ 13, 87-96.

As a result, Plaintiff requests certification of a class of similarly situated persons, and seeks to recover, *inter alia*, the payments she and class members have made to American First. *Id.*, *ad damnum* clause.

## B. American First's Arbitration Motion

American First's Motion demands that the Court force Plaintiff's claims into individual confidential arbitration. American First filed with its Motion a declaration of Tom Nusspickel (ECF No. 16-1) (the "Nusspickel Declaration"), who is the Chief Operating Officer of American First.

The Nusspickel Declaration attaches a copy of what it attests is Plaintiff's rental purchase agreement. *See* ECF No. 16-3 (the "Rental Purchase Agreement"). Although the Nusspickel Declaration states that goods are leased "from" the "merchant partner," the Rental Purchase Agreement lists American First as the "[l]essor." *Id.* Indeed, no "merchant partner" is ever mentioned in the Rental Purchase Agreement. Instead, American First defines itself as "we," "us," and "our" for the purposes of the Rental Purchase Agreement:

> In this Agreement, "we," "us," and "our" refer to American First Finance, Inc., Lessor.

Rental Purchase Agreement, p. 1. "You" and "your" are defined to refer to the Plaintiff. *Id.*

The Rental Purchase Agreement also contains a purported arbitration agreement, some of the terms of which are included under the heading "Arbitration Provision." *See*, *e.g.*, Rental Purchase Agreement at pp. 4-6. And the purported arbitration agreement includes a purported delegation agreement, under which certain questions of arbitrability are supposedly required to be arbitrated. *See* Rental Purchase Agreement p. 4 ¶ 1.b.[1]

But the Rental Purchase Agreement also contains an extraordinary provision which gives American First the unfettered unilateral right to change the arbitration and delegation "agreements" and avoid any promise to arbitrate. In particular, the Change Clause states as follows:

> You understand that no changes may be made to this Agreement ***except by us in writing***.

Rental Purchase Agreement ¶ 21 (emphasis added). As mentioned above, "us" is expressly defined to mean only American First. *See* Rental Purchase Agreement at p. 1.

---

[1] American First's Motion does not invoke any delegation agreement. Indeed, American First demands that this Court – not an arbitrator – decide arbitrability issues. Nevertheless, a plaintiff's failure to specifically challenge a delegation agreement may undermine an attempt to avoid arbitration. *See*, *e.g.*, *Devine v. Bethesda Softworks, LLC*, 636 F. Supp. 3d 564, 571 (D. Md. 2022) ("if the arbitration agreement contains a delegation clause, the court does not reach the question of the arbitration agreement's enforceability unless the delegation clause is specifically challenged." (*citing Rent-A-Center W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010) ("[U]nless [the party] challenged the delegation provision specifically, we must treat it as valid ...."); *Novic v. Credit One Bank, Nat'l Ass'n*, 757 F. App'x 263, 266 (4th Cir. 2019) ("[A]bsent a challenge to the validity of such delegation, courts will not intervene in interpreting the parties' agreement."). Here, Plaintiff specifically challenges the formation of the delegation clause. Plaintiff asserts that the Change Clause renders the delegation clause without consideration and illusory, because it allows American First to change or remove any promise to delegate arbitrability disputes.

### III.    Legal Standards

#### A.  Arbitration Cannot Be Compelled in the Absence of a Binding Arbitration or Delegation Agreement

Without both parties' consent, a dispute cannot be sent to arbitration in the absence of a legally binding arbitration agreement. *See Moses H. Cone Memorial Hospital v. Mercury Const.*, 460 U.S. 1, 19-20 (1983). A "delegation agreement" is simply a "mini-arbitration agreement within a broader arbitration agreement within a broader contract." *MZM Constr. Co., Inc. v. New Jersey Bldg. Laborers Statewide Benefit Funds*, 974 F.3d 386, 399 (3d Cir. 2020) ("*MZM*"). *See also Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 68 (2010) ("*Rent-A-Ctr.*") ("The delegation provision is an agreement to arbitrate threshold issues concerning the arbitration agreement.")

#### B. There Is No Presumption in Favor of the Existence of an Arbitration Agreement – American First Bears the Burden Here

There is no presumption in favor of finding the existence of an arbitration agreement. As the Supreme Court recently held, "[t]he FAA …places arbitration agreements on an ***equal footing*** with other contracts." *Coinbase, Inc. v. Suski*, 144 S. Ct. 1186, 1192 (2024) (emphasis added, *quoting Rent-A-Center, West, Inc. v. Jackson,* 561 U.S. 63, 67 (2010)). Accordingly, the applicable "policy is to make 'arbitration agreements as enforceable as other contracts, ***but not more so***.'" *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022) (emphasis added, *quoting Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404, n. 12 (1967)). The existence of arbitration or delegation agreements is determined "upon the same footing as other contracts." *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219 (1985); *see also Loc. Union No. 637, Int'l Bhd. of Elec. Workers, AFL-CIO v. Davis H. Elliot Co.*, 13 F.3d 129, 133 (4th Cir. 1993) ("questions about the existence of the agreement itself or its terms should ***not be interpreted with … deference to arbitration***. Rather, traditional principles of contract interpretation should apply.") (emphasis added).

Accordingly, there is no presumption in favor of arbitration on the threshold issue of whether any legally formed arbitration (or delegation) agreement *exists*:

> Before we may enforce the Arbitration Agreement, we must be satisfied that a valid agreement exists. The presumption favoring arbitration does not apply to this preliminary question of the Arbitration Agreement's validity.

*Coady*, 32 F.4th at 291 (emphasis added, citing *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 302–303 (2010); *Noohi*, 708 F.3d at 611 n.6); *see also Mey v. DIRECTV, LLC*, 971 F.3d 284, 304 (4th Cir. 2020) (there is no "presumption in favor" of finding that a binding arbitration (or delegation) agreement exists).

Instead, "***a defendant who seeks to compel arbitration … bears the burden of establishing the existence*** of a binding contract to arbitrate the dispute." *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 456 (4th Cir. 2017) ("*Minnieland*") (emphasis added).

### C. The Allegations of the Complaint Are Taken as True

The allegations of the Complaint are accepted as true at this stage. *See Rowland v. Sandy Morris Fin. & Est. Plan. Servs., LLC*, 993 F.3d 253, 257 (4th Cir. 2021) (in reviewing a motion to compel arbitration, the Court "'accept[s] as true the allegations of the ... Complaint that relate to the 'underlying dispute between the parties.'") (*quoting Berkeley*, 944 F.3d at 233). *See also Convergence Mgmt. Assocs., Inc. v. Callender*, No. CV TDC-15-4015, 2016 WL 6662253, at *2 (D. Md. Nov. 10, 2016) (on a Fed. R. Civ. P. 12(b)(3) motion, "***[a]ll well-pleaded allegations in the complaint bearing on the question of venue are taken as true***, and the Court views the facts in the light most favorable to the plaintiff.") (emphasis added, *citing Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 365-66 (4th Cir. 2012)).

## IV.   Argument

The question presented here involves fundamental contract principles for the Court, not an arbitrator, to decide – whether, under Maryland law, any arbitration or delegation agreements exist. As discussed below, those fundamental contract principles dictate that no such agreements exist. Because American First reserved the right to unilaterally change the arbitration and delegation "agreements," the consideration required for arbitration agreements in Maryland (a mutual, binding, promise to arbitrate) does not exist, and the "agreements" were never formed. [2]

### A.  The Court – Not an Arbitrator – Must Decide Plaintiff's Challenge that the Arbitration and Delegation "Agreements" Are Illusory

Although the arbitration "agreement" at issue includes a purported delegation agreement, American First's Motion does not ask the Court to delegate any arbitrability disputes to an arbitrator. Instead, the Motion demands that the Court decide arbitrability. Plaintiff agrees. Because Plaintiff's challenge is to the formation of both the arbitration and delegation "agreements," that challenge properly must be decided by the Court, and not an arbitrator.

### 1.    A Specific Challenge to the Formation of an Arbitration Agreement Is For a Court, Not an Arbitrator, to Decide

The Federal Arbitration Act, 9 U.S.C. §1 *et seq*. ("FAA") "requires that the district court — rather than an arbitrator — decide whether the parties have formed an agreement to arbitrate." *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 234 (4th Cir. 2019) ("*Berkeley*"). "Arbitration and delegation agreements are simply contracts, and, normally, if a party says that a contract is invalid, the court must address that argument before deciding the merits of the contract dispute."

---

[2] In recent years, the Fourth Circuit has consistently rejected the overreaching arbitration agreements of similar predatory lenders. *See Gibbs v. Haynes Invs., LLC*, 967 F.3d 332 (4th Cir. 2020); *Gibbs v. Sequoia Cap. Operations, LLC*, 966 F.3d 286, 290 (4th Cir. 2020); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666 (4th Cir. 2016).

*Coinbase, Inc.*, 144 S. Ct. at 1194.[3] *See also Watkins v. Carr,* No. CV PX-17-0819, 2018 WL 10741730, at *2 (D. Md. Jan. 12, 2018) ("the Court must determine whether the parties entered into an express agreement to arbitrate that is 'validly formed' and 'legally enforceable.' ") (citations omitted); *Lyles*, 2020 WL 1985043, at *3 ("Even when questions of arbitrability have been delegated…the court must decide issues concerning contract formation.")

The Court must also decide whether any delegation agreement has been formed. *See Coinbase, Inc.*, 144 S. Ct. at 1191 ("before … the delegation provision … can be enforced, a court needs to decide what the parties have agreed to"); *Berkeley*, 944 F.3d at 234 n. 9 ("[P]rovisions requiring the arbitration of arbitrability questions do not, however, undermine § 4 of Title 9 and preclude a court from deciding that a party never made an agreement to arbitrate any issue (which would necessarily encompass an arbitrability issue.")

Contract validity questions, which may in some cases be delegated to an arbitrator, are distinct from contract formation questions, which may not be delegated to an arbitrator. Questions of formation – the questions presented here – are distinct from questions of "validity":

> Pursuant to established Supreme Court precedent, however, there's an important distinction between arguments challenging the <u>validity</u> of an agreement and those challenging an agreement's <u>formation</u>. *See Buckeye*, 546 U.S. at 444 n.1, 126 S.Ct. 1204 ("The issue of the contract's validity is different from the issue [of] whether any agreement ... was ever concluded. Our opinion today addresses only the former."); *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 n.2, 130 S.Ct. 2772, 177 L.Ed.2d 403 (2010) (same). … **One could challenge the formation of a contract by claiming** one of the essential elements (offer, acceptance, and **consideration) is missing**.

---

[3]     A specific challenge to the legal existence of arbitration or delegation agreements – presented here – is distinct from a challenge *only* to an underlying agreement, which does not specifically dispute the "existence of an arbitration agreement," as in *Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 19 (2012), or a delegation provision, as in *Rent-A-Ctr.*, 561 U.S. at 73.

*Nat'l Fed'n of the Blind v. The Container Store, Inc.*, 904 F.3d 70, 80–81 (1st Cir. 2018) (underline emphasis in original, bold italics added). Accordingly, one way to attack the formation of an arbitration agreement is to assert that it lacks consideration.

### 2. Whether the Purported Arbitration and Delegation Agreements Are Illusory Is a Question of Contract Formation

The question presented here of whether an arbitration agreement is illusory is the question of whether consideration exists – a formation issue. *See Cheek*, 835 A.2d at 662 (if a promise is illusory, "the result is that ***no contract is created***.") (emphasis added) (citation omitted); *see also Noohi*, 708 F.3d at 611 (illusory arbitration agreement lacks consideration."); *Windesheim v. Verizon Network Integration Corp.*, 212 F. Supp. 2d 456, 462 (D. Md. 2002) (Where there is no "consideration—***critical to contract formation***— …[a] promise is "illusory" in the sense that it is not legally enforceable in an action for breach of contract.") (emphasis added).[4]

Accordingly, Plaintiff's challenge that the arbitration and delegation agreements are illusory is a challenge to the formation and existence of any arbitration or delegation agreements. It is for this Court, not an arbitrator, to decide.

---

[4] Under some other states' contract laws, a challenge that an arbitration or delegation agreement is "illusory" is not a formation challenge and can be delegated. *See, e.g., Arnold v. Homeaway, Inc.*, 890 F.3d 546, 554 (5th Cir. 2018) and *In re Cox Enters., Inc. Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1211 (10th Cir. 2016) ("*Cox*"). *Arnold* and *Cox* both involved the laws of states which allow parties to "borrow" consideration from the underlying contract to sustain an arbitration agreement. 890 F.3d at 551; 835 F.3d at 1209, 1211-12. But the *Fourth* Circuit has repeatedly and directly held that Maryland does *not* allow borrowing consideration – it requires a mutual agreement to arbitrate. *See Noohi*, 708 F.3d 599, 609 ("Under Maryland law as articulated in *Cheek*, an arbitration provision must be supported by consideration ***independent of the contract underlying it***, namely, ***mutual obligation***.") (emphasis added); *Coady*, 32 F.4th at 291 (same). *see also Cox v. Time Warner Cable, Inc.*, 2013 WL 5469992, at **4-5 (D.S.C. Sept. 30, 2013) (distinguishing *Noohi* because it applied Maryland law, and held that under different *South Carolina* law, "the arbitration clause…requires no independent consideration.")

## B. If One Party Can Unilaterally Exempt Themselves from Arbitration, an Arbitration "Agreement" Is Illusory

"Under Maryland law, a promise to arbitrate is illusory—and thus cannot constitute the consideration necessary to support a binding contract—if the employer reserves the right 'to alter, amend, modify, or revoke the Arbitration Policy ... at any time with or without notice.'" *Coady*, 32 F.4th at 292 (*citing Cheek*, 835 A.2d at 662); *see also Noohi*, 708 F.3d at 609 ("Under … *Cheek*, an arbitration provision must be supported by … mutual obligation" to arbitrate.)

*Cheek*'s rule applies equally where the arbitration "agreement" is contained within a larger agreement which also contains non-arbitration terms, when the terms of that larger contract provide that the agreement's terms can be unilaterally changed without advance notice or an opportunity to reject the changes. *See*, *e.g.*, *Coady*, 32 F.4th at 293 (modification clause applied to an arbitration provision where it was incorporated into the contract which contained the arbitration provision). This was also the situation in *Dumais* − a decision *Cheek* endorsed. *See Cheek*, 835 A.2d at 663 (in *Dumais*, employee handbook "included" an arbitration provision *as well as* a change-in-terms clause).

Importantly, only a promise to arbitrate qualifies as consideration for an arbitration agreement under *Cheek*. *Cheek* does not permit consideration from the underlying agreement to be used as consideration for an arbitration agreement:

> We disagree with cases from other jurisdictions that determine that consideration for an underlying contract also can serve as consideration for an arbitration agreement within the contract, even when the arbitration agreement is drafted so that one party is absolutely bound to arbitrate all disputes, but the other party has the sole discretion to amend, modify, or completely revoking the arbitration agreement at any time and for any reason.

*Cheek*, 835 A.2d at 667; *see also Noohi*, 708 F.3d at 609 (Fourth Circuit's endorsement of this holding).

**C. American First's Change Clause Makes the Purported Arbitration and Delegation "Agreements" Illusory**

American First's Change Clause means that it made no real promise in the arbitration and delegation "agreements." The Change Clause applies to the arbitration and delegation "agreements," and gives American First the right to change those agreements at its whim without any notice or restrictions on retroactive modifications. *See* parts IV.C.1 – 4, *infra*. Whether or not American First used the Change Clause makes no difference – its presence means no real promise to arbitrate was made. *See* part IV.C.5, *infra*. And the Change Clause cannot be re-written or stricken now, to create an arbitration agreement where none existed before. *See* part IV.C.6, *infra*. Furthermore, any ambiguities in contract language must be construed against American First, and against the existence of an arbitration agreement. *See* part IV.C.7, *infra*. American First also cannot show the existence of any arbitration agreement in this case through estoppel, implied covenants, or severance. *See* part IV.C.8, *infra*. This Court and many others have held that the same type of change clause used here makes arbitration and delegation agreements illusory. *See* part IV.C.9, *infra*. For all of those reasons, discussed below, American First's arbitration and delegation agreements are illusory.

**1.    The Change Clause Applies to the Arbitration and Delegation Agreements**

The Change Clause applies to the arbitration and delegation "agreements." The Change Clause allows American First to make unilateral written changes to "this agreement," and "Agreement" is defined to mean "this Consumer Rental Purchase Agreement." Rental Purchase Agreement at p. 1 & ¶ 21. The Consumer Rental Purchase Agreement contains the arbitration and delegation "agreements." *See id*. Indeed, the arbitration provision refers to itself as being part of "this Agreement" – i.e., the Rental Purchase Agreement. *Id*. at p. 4 ¶ 1.a.

By stating that American First reserved the right to change the "Agreement," the Change Clause reserves the ability to modify the arbitration and delegation provisions, which are literally within the "Agreement." *See Jones*, 2022 WL 834210, at *15 ("By stating that Prosper reserved the right to change any provision of "this Agreement," the modification provision also reserves the ability to modify the arbitration provision, a provision literally within "this Agreement." Prosper thus retained the right to change the arbitration agreement in any way—which would include Plaintiffs' ability to opt out of arbitration, Prosper's promise to arbitrate, and the terms of the arbitration provision.")

Because "[t]he change clause plainly applies to the arbitration clause … the Court may consider its effect on formation." *Ford*, 2024 WL 1340356, at *8 (citations omitted).

Nevertheless, American First may tell the Court that *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540 (4th Cir. 2005) means that the Court cannot look at the Change Clause, because it is not under the heading "Arbitration Provision." But *Coady* distinguished *Hill* from circumstances like those presented here. 32 F.4th at 292.

Unlike *Coady* and this case, *Hill* forbade looking outside a free-standing, *separate* arbitration agreement, to a *different* document, to find a unilateral modification clause. *See id*. Where, as here, an arbitration provision is part of a larger contract with a unilateral modification clause, "[t]he agreement is in contrast to *Hill*, in which the arbitration agreement was a completely separate document, and is more similar to *Caire* and *Coady*, in which the arbitration agreements were contained within the contract." *Jones*, 2022 WL 834210, at *14; *see also Hayes*, 811 F.3d at 676 ("it is only natural for us to interpret the arbitration agreement in light of the broader contract in which it is situated."); *Dillon*, 856 F.3d at 336 (the "effect of the arbitration agreement is unambiguous in

the context of the whole contract," and was unenforceable); *Gibbs*, 967 F.3d at 341–43 (considering "the terms of both the loan and arbitration agreements").[5]

Here, the unilateral modification provision is within the four corners of the same document as the Arbitration Provisions – the Rental Purchase Agreement. *See, e.g.,* Rental Purchase Agreement p. 4 ¶ 26 (defining "Claim" as a dispute that "arises from…this Agreement"). Thus, the Change Clause applies to the arbitration provision under the plain language of the Agreement. Under the plain adhesion[6] text, the Change Clause is part of the arbitration "agreement."

### 2.  The Change Clause Gives American First the Unfettered Right to Unilaterally Change Any Promise to Arbitrate

Under the express contract language here, American First reserves the right to unilaterally change the arbitration and delegation agreements without providing any opportunity for Plaintiff to reject the changes and without even providing for any notice of the changes.

" 'The cardinal rule of contract interpretation is to give effect to the parties' intentions.' " *Philadelphia Indem. Ins. Co. v. Markel Ins. Co.*, No. CV RDB-20-0669, 2021 WL 2434409, at *7 (D. Md. June 14, 2021) (citations omitted). "To determine the parties' intentions, courts look first to the written language of the contract." *Id.* (*quoting Walton v. Mariner Health of Maryland, Inc.*, 894 A.2d 584, 594 (Md. 2006) ("Generally, when seeking to interpret the meaning of a contract our search is limited to the four corners of the agreement.")

---

[5]      American First may cite *Cherdak v. ACT*, 437 F. Supp. 3d 442 (D.Md. 2020) for a contrary proposition. *Coady*, 2020 WL 6785352, at *5, declined to follow *Cherdak* and was affirmed by the Fourth Circuit. *See also Jones* 2022 WL 834210, at *15 (same).

[6]      The "agreements" at issue are of "adhesion." *See Mould v. NJG Food Serv. Inc.*, 986 F. Supp. 2d 674, 678 (D. Md. 2013) (take-it-or-leave it contract is one of adhesion).

Looking to the "written language of the contract" here, the Change Clause gives "us" - American First - the unlimited and unilateral right to change the agreement, so long as the change is in writing:

> You understand that no changes may be made to this agreement ***except by us in writing***.

Rental Purchase Agreement ¶ 21 (emphasis added); *see also id*. at p. 1 (defining American First as "we," "us," and "our" and Plaintiff as "You" and "your.")

The fact that the Change Clause "except[s]" written changes by American First from the general prohibition on changes to the agreement means that the clause *allows* American First to make unilateral changes and allows it to avoid any promise to arbitrate:

> The term "exception" is commonly defined to mean "something that is excluded from a rule's operation," "a person or thing that ... does not follow a rule," or "a case where a rule does not apply." These definitions necessarily imply the existence of a rule that is generally followed, from which the exception deviates.

*Shelnutt v. Mayor*, 776 S.E.2d 650, 656 (Ga. App. 2015) (citing Black's Law Dictionary (10th ed.2014); Oxford Advance Learner's Dictionary, online at http://www.oxforddictionaries.com/definition/english/exception; Merriam–Webster's Online Dictionary, http://www.merriam-webster.com/dictionary/exception); *see also Nat'l Cmty. Reinvestment Coal. v. Consumer Fin. Prot. Bureau*, No. CV 20-2074 (BAH), 2022 WL 4447293, at *17 (D.D.C. Sept. 23, 2022) ("exception" is defined as "[s]omething that is excepted; a particular case which comes within the terms of a rule, but to which the rule is not applicable; a person or thing that does not conform to the general rule affecting other individuals of the same class.")(citing Oxford Eng. Dictionary, https://www.oed.com/view/Entry/65724?rskey=v5rOd6&result=1&isAdvanced=false#eid (last visited Sept. 22, 2022).

Indeed, virtually identical language made an arbitration agreement illusory in *Piano v. Premier Distrib. Co.*, 107 P.3d 11, 15 (N.M. 2004). *Piano*'s change-in-terms provision stated:

> I understand that this handbook represents the current policies, regulations, and benefits, and that **except for employment at-will status and the Arbitration Agreement**, any and all policies or practices can be changed at any time by the Company. The Company retains the right to add, change or delete wages, benefits, policies and all other working conditions at any time (except the policy of "at-will employment" and Arbitration Agreement, which **may not be changed, altered, revised or modified unless in writing and signed by the Owner of the Company**).

*Id.* (emphasis added).

There is no material distinction between the change clause in *Piano* and the Change Clause here. In *Piano*, the portion of the change clause applicable to the arbitration agreement says that the agreement "may not be changed, altered, revised or modified **unless in writing and signed by the Owner of the Company**." *Id.* (emphasis added). Here, the Change Clause says, "no changes may be made to this agreement **except by us in writing**." Rental Purchase Agreement ¶ 21 (emphasis added); *see also id.* at p. 1 (defining "us" to mean American First).

In *Piano*, the "most natural reading" of that materially identical change clause was that the defendant could unilaterally change the arbitration agreement:

> The most natural reading of these two sentences is that although Defendant cannot modify the terms of the Arbitration Agreement any way or at any time, it may, in its sole discretion, modify the terms of the Arbitration Agreement provided that it complies with the minimal formalities set forth. The Agreement is completely silent with respect to Plaintiff's signature or approval.

107 P.3d at 15. Accordingly, *Piano* held that the change in terms clause made the arbitration agreement illusory. And, *Piano* rejected the defendant's argument "that the term 'in writing' in the second excerpted sentence must be read to mean a writing signed by both parties" because "[t]he agreement… does not include the wording Defendant requests we imply." *Id.* at 16. *Piano* also read any ambiguity against the defendant. *Id.* ("to the extent there is any ambiguity in the Arbitration

Agreement about whether Plaintiff's signature is required on any writing altering its terms, we construe the ambiguity against Defendant.") (*citing, inter alia, Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir.2002)).[7]

The Change Clause here similarly makes the arbitration and delegation "agreements" illusory. The Change Clause allows American First alone to change the agreement, subject only to the restriction that the change be "in writing." Nothing in the language of the Change Clause requires Plaintiff's signature, nothing requires Plaintiff to assent to American First's changes, nothing even requires any notice of any sort to Plaintiff about the changes. Because American First can unilaterally change the arbitration and delegation agreements, it has made no real promise to arbitrate anything. American First is not "bound" to arbitrate, so its arbitration and delegation agreements are illusory. *See Coady*, 32 F.4th at 292.

The plain, almost unlimited text of the Change Clause distinguishes this case from one like *Holloman v. Cir. City Stores, Inc.*, 894 A.2d 547, 554 (Md. 2006), where the terms of the change clause had significant and explicit restrictions which prevented the defendant from avoiding arbitration:

> under the terms of the agreement, Circuit City is bound to the terms of the arbitration agreement for 364 days, must provide thirty-days notice prior to any modification and may only alter the agreement on a single day out of the year to become effective during the next day. Holloman, under these terms, could have the opportunity to arbitrate any "grievance" with Circuit City under the terms explicated during the 30–day window without fear of recission or alteration by Circuit City.

*Id.*

---

[7]     Although some subsequent decisions in other jurisdictions have distinguished *Piano* on the grounds that consideration from the underlying contract could provide consideration for an arbitration agreement, *Cheek* forbids "borrowing" consideration from the underlying contract as discussed above. *See Cheek*, 835 A.2d at 667.

Similarly distinguishable are cases like *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 672-73 (Md. 2009), which construed a termination *for convenience* clause, where the text of the agreement put restrictions on termination. *Id*. The Court specifically *contrasted* termination for convenience clauses with the type of unlimited Change Clauses at issue here and in *Cheek*. *Id*. American First's Change Clause is not, like the termination clause in *Questar*, limited by "convenience," or by anything but the requirement that changes be "in writing." Rental Purchase Agreement ¶ 21.[8] The Change Clause gives American First the unfettered right to change its obligations and makes the arbitration and delegation "agreements" illusory.

### 3.     No Notice Requirement Saves the Illusory "Agreements"

American First's Change Clause does not require *any* notice of changes – it only requires that the changes be "in writing." That distinguishes this case from ones where a unilateral change provision is accompanied by a notice requirement, like the one in *DIRECTV, Inc. v. Mattingly*, 829 A.2d 626, 639 (Md. 2003), where "[u]nder the ***plain language*** of the … customer agreement … petitioner was contractually obligated to provide respondent with "written notice describing" any changes." (emphasis added). The plain language here includes no notice requirement – so no restrictions on modification are "set forth" in the agreement. *See Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 575 F. Supp. 2d 696, 707 (D. Md. 2008) ("*Mattingly*…made clear that its holding depended on the fact that a party with power to unilaterally modify an agreement should be strictly held to the modification terms ***it sets forth***.") (emphasis added). American First's Change Clause allows it to change the arbitration or delegation "agreements" without any notice at all.

_____

[8]     As *Holloman* and *Questar* reflect, cases where unilateral modification clauses did not result in an illusory contract typically involve a clause that includes specific conditions for exercising the modification. No such conditions are present here.

### 4. The Change Clause Does Not Include any Restriction on Retroactive Modifications

A trilogy of persuasive decisions explains why a unilateral modification clause which does not explicitly prohibit retroactive changes – like the Change Clause here – results in an illusory arbitration agreement, even if notice of changes is required:

> both *Torres* [*v. S.G.E. Mgmt., LLC*, 397 Fed.Appx. 63, 68 (5th Cir.2010)] and *Morrison* [*v. Amway Corp.*, 517 F.3d 248, 254 (5th Cir. 2008)] hold that notice is insufficient when retroactive amendment is possible. In *Torres*, we considered an arbitration provision to which amendments would become binding "upon notice" "or by publication." 397 *Fed.Appx.* at 66. ***Despite the fact that notice was being provided, we held that because amendments became effective immediately and because there was no savings clause excepting pending disputes from amendment, the agreement was illusory***. *Id*. at 68. Similarly, in *Morrison*, amendments to the arbitration provision were to be "published ... in official Amway literature." 517 F.3d at 254. Despite this provision for notifying its distributors of changes to the arbitration agreement, we still held that the agreement was illusory: "While it is inferable that an amendment thus unilaterally made by Amway to the arbitration provision would not become effective until published, there is nothing to suggest that once published the amendment would be inapplicable to disputes arising, or arising out of events occurring, before such publication." Id.

*Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202, 207–08 (5th Cir. 2012) (emphasis added). The Court of Appeals of Missouri reached a similar conclusion:

> [i]n this case, Bristol's alleged mutual promise to arbitrate is conditioned on Bristol's unilateral "right to amend, modify or revoke this agreement ***upon thirty (30) days' prior written notice to the Employee***." The quoted language does not limit Bristol's authority to modify the arbitration agreement unilaterally and retroactively. If Bristol retains unilateral authority to amend the agreement retroactively, its promise to arbitrate is illusory and is not consideration.
>
> Bristol asserts that the requirement of prior written notice means that any modifications must apply prospectively only. ***The fact that Bristol must give prior written notice of an amendment to the arbitration agreement does not preclude Bristol from giving Baker prior written notice that, effective in thirty days, Bristol retroactively is disclaiming a promise made in the arbitration agreement***. For instance, if in the course of an ongoing arbitration process, Bristol concluded that the process was not favorable, Bristol could provide Baker notice that, effective in 30 days, it no longer would consider itself bound by the results of the arbitration.

*Baker v. Bristol Care, Inc.*, 450 S.W.3d 770, 776–77 (Mo. 2014) (emphasis added, footnote omitted).

Those decisions are persuasive. Here, as in *Torres*, *Morrison*, *Carey*, and *Baker*, nothing in the Change Clause limits retroactive changes. Nothing prevents American First from eliminating arbitration or delegation entirely or restricting it to certain claims and disputes, retroactively. *Id.*[9] Nothing exempts pending disputes from unilateral amendment. Accordingly, the arbitration and delegation "agreements" are illusory.

> **5.    The Change Clause Makes the Arbitration Provisions Illusory, Whether or Not It Was Used**

Even if American First has not used the Change Clause to modify the arbitration or delegation "agreements," the mere presence of the Change Clause makes the arbitration and delegation provisions illusory:

> United initiated the arbitration with Cheek; ***it has not revoked nor in any way altered the Arbitration Policy with Cheek at any time***. Nonetheless, the fact that 'United HealthCare reserves the right to alter, amend, modify, or revoke the [Arbitration] Policy at its sole and absolute discretion at any time with or without notice' creates no real promise, and therefore, insufficient consideration to support an enforceable agreement to arbitrate.

*Cheek*, 835 A2d at 662 (emphasis added). *See also Jones*, 2022 WL 834210, at *16 ("It does not matter that [defendant] did not, in fact, change the arbitration provision.") (*citing Cheek*).

---

[9]    Quite different are cases where the change in terms provisions require advance notice of changes, or permit only prospective application. *See Holloman v. Cir. City Stores, Inc.*, 894 A.2d 547, 554 (Md. 2006) (30-days advance notice required, so plaintiff could arbitrate during a "30-day window without fear of recission or alteration by Circuit City."); *Am. Gen. Life & Acc. Ins. Co. v. Wood*, 429 F.3d 83, 91 (4th Cir. 2005) (change in terms did not render agreement illusory where "discretion [to change terms] is limited to prospective disputes and by specific notice requirements.") Unlike those cases, the Change Clause here requires ***no*** advance notice, and includes ***no*** restriction on retroactive changes.

### 6.    The Agreement Cannot Be Rewritten to Provide Consideration

American First may ask the Court to re-write the agreement so that the Change Clause does not make the arbitration or delegation agreements illusory. That would be improper:

> It is … improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships.

*Canaras v. Lift Truck Servs., Inc.*, 322 A.2d 866, 873 (Md. 1974); *see also Piano*, 107 P.3d at 16 ("we decline Defendant's invitation to rewrite the Arbitration Agreement such that it is supported by consideration.")

The plain language of the Change Clause allows American First to make unilateral changes to the arbitration and delegation agreements, without any notice. That language cannot be modified now, to create an arbitration agreement where none existed.

### 7.    Any Ambiguity in Contract Language Is Resolved Against Arbitration

The contract language here is clear and unambiguous, as discussed above – it is in plain English, and its meaning is obvious. "[A] contract or provision thereof is ambiguous only where it is susceptible of more than one reasonable interpretation." *Macke Laundry Serv. Ltd. P'ship v. Alleco Inc.*, 743 F. Supp. 382, 384 (D. Md. 1989).

However, even if another "reasonable interpretation" of the Change Clause existed, the ambiguity would be resolved against arbitration. *Cheek* mandates that any ambiguities in contract language must be construed *against* finding the existence of an arbitration (or delegation) agreement. *See Cheek*, 835 A.2d at 663-64 (*quoting Dumais v. Am. Golf Corp.*, 299 F.3d 1216, 1219 (10th Cir. 2002)). The passage of *Dumais* which *Cheek* relied upon considered conflicting provisions – one which allowed unilateral modification, one which did not:

> American Golf Corporation's employee handbook…**included an arbitration provision**. … A provision of the handbook stated that American Golf "reserves the

right to at any time change, delete, modify, or add to any of the provisions contained in this handbook at its sole discretion" with the **_exception_** of the arbitration provision. *Id.* **_Another provision stated that American Golf had the right to amend, supplement, or revise everything in the handbook, and this provision did not exclude the arbitration provision_**. *Id.*

835 A.2d at 663 (emphasis added). *Dumais* resolved the conflict in favor of finding the agreement illusory. *Id*. at 664. The Court of Appeals "aligned" itself with that reasoning. *See id.*; *see also Holloman v. Cir. City Stores, Inc.*, 894 A.2d 547, 553 (Md. 2006) (in *Cheek*, "we aligned ourselves" with *Dumais*.)

Here as well, any ambiguity in the language of American First's adhesion contract must be construed against the drafter – American First. *See Rouse Co. v. Fed. Ins. Co.*, 991 F. Supp. 460, 466 (D. Md. 1998) ("It is well-settled in Maryland that when a genuine ambiguity exists in a contract, it will be resolved against the drafter of the contract under the principle of *contra proferentum*.")

### 8. Implied Covenants, Estoppel, and Severance Cannot Save the Arbitration and Delegation "Agreements."

American First may argue that the Court should fix the arbitration and delegation agreements by using the implied covenant of good faith and fair dealing, equitable estoppel, or by severing offending clauses – arguments which are irreconcilable with *Cheek* and its progeny. As a panel with Justice Souter (Ret.) held in *Nat'l Fed'n of the Blind*, 904 F.3d at 87, such arguments fail where the state supreme court has "sa[id] nothing" to support them. *Id.*

Indeed, those arguments were raised in *Jones*, but the Court rejected them, noting the "ample case law" available. *See, e.g.*, *Jones*, 2022 WL 834210, at *19 (declining to certify question to Maryland Court of Appeals of "whether consideration for an arbitration agreement exist[s], by application of an implied covenant of good faith and fair dealing, equitable estoppel, or otherwise" because there is "ample case law, both binding and persuasive, to draw from in determining whether a contract to arbitrate exists.") Fixing the purported arbitration and delegation agreements so that they legally exist would contravene that "ample authority." First, any ambiguities about the

existence of an arbitration agreement must be resolved against American First, the drafter. *See Cheek*, 835 A.2d at 663-64 (quoting *Dumais*, 299 F.3d at 1219); *Rouse Co.*, 991 F. Supp. at 466.

Second, the Fourth Circuit in *Noohi* applied *Cheek* to a case where the breach of the implied covenant of good faith and fair dealing was a *claim* asserted in the *plaintiffs' complaint*. 708 F.3d at 603. Yet the Fourth Circuit – squarely presented with a case where the implied covenant was at issue – did not find that the implied covenant impaired the holding of *Cheek*; it instead ratified *Cheek* in no uncertain terms. *See id.* at 613. In this case, no contract claim is even at issue.

Third, an implied covenant of good faith and fair dealing is implied into an *existing* contract. But Plaintiff *challenges* the *existence* of any arbitration agreement. *See G & M Oil Co. v. Glenfed Fin. Corp.*, 782 F. Supp. 1078, 1083 (D. Md. 1989) (claim for breach of good faith and fair dealing "is viable only if an underlying contract exists"). A unilateral modification provision prevents arbitration contract *formation*. *See Cheek*, 835 A.2d at 662; *Noohi*, 708 F.3d at 609. A covenant cannot be implied to make the unformed contract exist.[10]

In addition, the covenant of good faith and fair dealing in Maryland cannot be used to contradict the express terms of a contract. *Enfield Equip. Co. v. John Deere Co.*, 64 F. Supp. 2d 483, 486 (D. Md. 1999). Here, the Change Clause permits American First to make unilateral changes to the agreement, with the only restriction being that the changes must be "in writing." Rental Purchase Agreement ¶ 21. To use the implied covenant to contradict this language, to add

---

[10] "[A]rbitration-clause cases" like *Cheek* are distinct from cases involving "an 'open term' that has good reason to change over time, is premised upon a mutually enforceable agreement, and is limited by the implied covenant [of] good faith and fair dealing." *Bindagraphics, Inc. v. Fox Grp., Inc.*, 377 F. Supp. 3d 565, 576 n.5 (D. Md. 2019) (emphasis added) (*citing Cheek*, 835 A.2d 656).

restrictions to American First's right to make changes, would impermissibly contradict the agreement's plain language.[11]

Equitable estoppel is similarly inapplicable. Defendant may argue that Plaintiff accepted the benefits of an agreement and is equitably estopped from disclaiming its obligations. But in Maryland, the "benefit" to Plaintiff of an *arbitration agreement* is a mutual agreement to arbitrate. *See Caire*, 982 F. Supp. 2d at 592 ("mutual exchange of promises to arbitrate disputes represent[] the necessary consideration in support of an arbitration agreement.") Plaintiff did not get that "benefit;" the Change Clause meant American First was not promising to arbitrate. Plaintiff cannot be estopped on the basis of a benefit she did not receive. And, under *Cheek*, consideration from the underlying agreement may not be used to provide consideration for an arbitration agreement. *Cheek*, 835 A.2d at 667. If "benefits" (*i.e.* consideration) from an underlying contract could support the existence of an arbitration agreement via equitable estoppel – when the alleged "benefits" are not a mutual agreement to arbitrate – that would allow, indirectly, exactly what *Cheek* prohibits.

Moreover, for an "equitable estoppel" argument to apply, Plaintiff must be asserting a breach of contract claim. *See Weckesser v. Knight Enterprises S.E., LLC*, 735 F. App'x 816, 823 (4th Cir. 2018) ("equitable estoppel may be appropriate when a party brings a lawsuit based on a contract (***thus presuming its validity***), but then seeks to escape an arbitration clause contained in that

---

[11] Furthermore, an implied covenant of good faith and fair dealing cannot apply where, as here, there is an "unlimited" unilateral modification clause. *See Stamatiades v. Merit Music Serv., Inc.*, 124 A.2d 829, 838 (Md. 1956) (explaining why an "unlimited" option to modify cannot be saved by the implied covenant, but a modification option which required a "necessity" can be.) Here, as in *Cheek*, the unilateral modification option is "unlimited." *See also Bank of Am., N.A. v. Jill P. Mitchell Living Tr.*, 822 F. Supp. 2d 505, 527 (D. Md. 2011) (approving modification clauses *limited* by advance notice); *Questar Builders, Inc.*, 978 A.2d at 673 (a covenant of good faith and fair dealing could apply to a modification clause in a construction contract, so long the modifying party was "irrevocably bound for [some] appreciable time" or "otherwise rendered some performance capable of operating as a consideration.")

same document."); *Mowbray v. Zumot*, 536 F. Supp. 2d 617, 622 (D. Md. 2008) (same); *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 449 F. App'x 704, 709 (10th Cir. 2011) (Equitable estoppel only applies where "it would be unfair to allow the signatory to rely on the agreement in formulating its claims but to disavow availability of the arbitration clause of that same agreement.") (citations omitted); *see also Zappos*, 893 F. Supp. 2d at 1066 ("equitable estoppel…prevents a plaintiff signatory to a contract that contains an arbitration provision from avoiding the agreement to arbitrate ***if the plaintiff's claims rely on the contract as the basis for relief***.") (emphasis added). Plaintiff does not rely upon or presume the validity of American First's contracts to establish liability or argue that any contract is valid. All of Plaintiff's claims are statutory; she is pressing no contract claims. So equitable estoppel cannot apply.

Severance would also be improper. The issue here is lack of consideration. It is hard to imagine how lack of consideration – one of the essential elements of a contract – could be "severed" to make the arbitration contract exist. Neither *Coady*, nor *Noohi*, nor *Cheek*, authorized such an approach. *See*, *e.g.*, *Piano*, 107 P.3d at 16 (rejecting defendant's severance argument and holding that "[b]ecause we conclude that the agreement is not supported by consideration, a contract was never formed. …Therefore, we decline Defendant's invitation to rewrite the Arbitration Agreement such that it is supported by consideration.") Furthermore, the Fourth Circuit has repeatedly rejected using severance to save arbitration in similar circumstances. *See Dillon*, 856 F.3d at 336 ("Unlawful portions of a contract may be severed *only* if: (1) the unlawful provision is not central or essential to the parties' agreement; and (2) the party seeking to enforce the remainder negotiated the agreement in good faith.") (emphasis added); *see also Hayes*, 811 F.3d at 676. Here, American First was not acting in good faith; it was intentionally perpetrating lending practices in violation of fundamental Maryland public policy.

*See* Compl. ¶ 8; *see also Dillon*, 856 F.3d at 336 (rejecting use of severance where defendant drafted arbitration agreement "to avoid the application of state and federal consumer protection laws").

9.     **This Court and Many Others Have Repeatedly Refused to Compel Arbitration in Similar Circumstances**

This Court has repeatedly held, in circumstances materially identical to those presented here, that unilateral modification clauses render arbitration agreements illusory.

For example, in *Ford v. Genesis Fin. Sols., Inc.*, this Court considered a similar motion to compel arbitration where the purported arbitration agreement was also contained in a consumer contract with a change-in-terms clause. 2024 WL 1340356, at *2. The change-in-terms clause said:

> Subject to the limitations of applicable law, we may, at any time, change or remove any of the terms and conditions of, or add new terms and conditions to, this Agreement. If required by applicable law, we will mail written notice of such a change to you in the manner required by such law. As of the effective date, the changed or new terms will apply to new purchases and to the outstanding balance of your Account, subject to the limitations of applicable law.

*Id.* The *Ford* change clause thus has at least a veneer of restrictiveness – it makes unilateral changes "subject to the limitations of applicable law" and at least mentions "notice."

Nevertheless, the Court held that because the defendants could change the agreement and thereby "amend or revoke their promise to arbitrate," the promise is "illusory and is not sufficient consideration to support an arbitration agreement—unless there is some limitation on their authority to change the agreement." *Id.* at *9. The *Ford* defendant argued that the "applicable law" language limited its ability to unilaterally change the agreement. *Id.* But, as this Court held, "Maryland law does not restrict [defendants'] ability to revoke their promise to arbitrate by exercising their power under the change clause." *Id.* at *10 (*citing Cheek*, 835 A.2d at 662).

Here, there is not even language providing that notice will be provided if the law requires it. There is *no* mention of notice of changes. The Change Clause here does not claim that the right to make changes is "subject to law" or any legal restrictions. And, consistent with *Ford*, Maryland

law does not restrict American First's "ability to revoke [its] promise to arbitrate by exercising [its] power under the change clause." *Id*. Thus, the Change Clause here is, if anything, broader than the one that made the arbitration agreement in *Ford* illusory. Under *Ford*'s rationale, the Change Clause makes the arbitration and delegation "agreements" here illusory.

Similarly, in *Bailey v. Mercury Financial, LLC*, this Court considered another unilateral change-in-terms clause which was part of a consumer agreement that included an arbitration provision. 2023 WL 6244591, at *1. In *Bailey*, the change-in-terms clause read:

> The rates, fees and terms of this Agreement (including its Jury Trial Waiver and Arbitration Clause), may change and we may add or delete any term. When required by law, we will provide advance written notice of any changes and any right to reject the changes.

*Id.* Once again, that change-in-terms clause in *Bailey* is, if anything, more restrictive on changes than American First's Change Clause. Yet the Court held that the *Bailey* change clause was broad enough to make the arbitration agreement illusory:

> a change-in-terms provision allowing the defendant to modify unilaterally an arbitration provision '[']with or without notice' creates no real promise, and therefore, insufficient consideration to support an enforceable agreement to arbitrate[,]' because it empowers the defendant to revoke the arbitration agreement at any time.

2023 WL 6244591, at *6 (*citing Cheek*, 835 A.2d at 662). Applying *Bailey*'s rationale here shows that American First's Change Clause makes the arbitration and delegation "agreements" illusory. The Change Clause does not require any notice – the only limitation on American First's unilateral changes is that they must be "in writing." Rental Purchase Agreement ¶ 21.

In *Johnson v. Cont'l Fin. Co., LLC*, this Court construed yet another unilateral change-in-terms clause in a consumer contract that also contained an arbitration provision. 2023 WL 5804281, at *1. The change-in-terms clause in *Johnson* was again, if anything, more restrictive on changes than the one presented here, and said:

> We can change any term of this Agreement, including the rate at which or manner in which INTEREST CHARGES, Fees, and Other Charges are calculated, in our sole discretion, upon such notice to you as is required by law. At our option, any change will apply both to your new activity and to your outstanding balance when the change is effective as permitted by law.

*Id.* at *2.

The Court held that this clause "allows [defendant] to alter at will any part of the Agreement, including the Arbitration Provision, such that the original bargained-for promises mean nothing." *Id.* at *5. As a result, the arbitration "agreement" was illusory. *Id.* The same is true here.

And in *Jones v. Prosper Marketplace, Inc.*, this Court held that "no agreement to arbitrate was formed" where the arbitration provision was in a contract with a similar lender which also contained a "modification provision" which allowed the lender "to change the arbitration provision at any time" – even though the provision in that case actually required notice:

> the modification provision gives "unfettered" discretion to Prosper. The modification provision does include a clause that "Prosper will give you notice of material changes to this Agreement[.]" *See, e.g.*, ECF No. 15-5 ¶ 14. But this is not a limitation on Prosper's ability to change terms in the same vein as *Holloman*. Prosper does not promise to give advance notice so that a borrower could invoke arbitration before a change becomes effective, nor does it contain any time limitation. The modification provision allows Prosper to change the arbitration provision at any time. The Court is not persuaded that the notice requirement within the modification provision limits Prosper's discretion enough such that Prosper's promise to arbitrate still constitutes a binding promise.

2022 WL 834210, at *16.[12]

Here, American First does not promise to give advance notice of changes so that a borrower could invoke arbitration before a change becomes effective, either; American First does not

---

[12]     *Jones* ultimately compelled arbitration, by enforcing a different arbitration agreement *which was not subject to a unilateral modification clause*. *See* 2022 WL 834210, at *16.

promise *any* notice. There is *no* time limitation on its unilateral amendment powers. American First can change the arbitration and delegation "agreements" at any time. Like the *Jones* defendant, American First made no binding promise to arbitrate.

Many other decisions, from this Court and across the country, are in accord. *See, e.g., Raley v. Whitestake Improvements LLC*, No. CV DLB-22-194, 2022 WL 3975189, at *4 (D. Md. Sept. 1, 2022) (rejecting arbitration motion due to unilateral modification clause); *Coady*, 2020 WL 6785352, at *1 (same); *Brent v. Priority 1 Auto. Grp., BMW of Rockville*, No. PWG-14-1705, 2016 WL 9724975, at *8 (D. Md. Aug. 4, 2016) (same); *Caire v. Conifer Value Based Care, LLC*, 982 F. Supp. 2d 582, 594 (D. Md. 2013) (same); *Davis v. Joseph J. Magnolia, Inc.*, 640 F. Supp. 2d 38, 46 (D.D.C. 2009) (arbitration agreement illusory where "it is far from clear that defendant lacks the power under the terms of the Form and Manual to alter its arbitration policy" and the policy "provides no mention of a notice period or other safeguards that in other cases have allowed disclaimers to exist without rendering the agreement illusory."); *Savostianov v. Fed. Advocs., Inc.*, No. CV 20-1711 (CKK), 2021 WL 1026018, at *3–4 (D.D.C. Mar. 17, 2021) (same, rejecting argument that bare "notice" redeemed illusory clause, where there was no specified time period for notice); *In re Zappos.com, Inc., Customer Data Sec. Breach Litig.*, 893 F. Supp. 2d 1058, 1065-66 (D. Nev. 2012) (same, collecting cases); *Jean v. Bucknell Univ.*, 2021 WL 1521724, at *13 (M.D. Pa. Apr. 16, 2021); *Simpson v. Synergenx Health Kingwood LLC*, 2021 WL 765410, at *5 (S.D. Tex. Feb. 25, 2021); *Wheeler v. Plano Arbor Hills LLC*, 2020 WL 6781609, at *4 (E.D. Tex. Nov. 18, 2020); *Esser v. Anheuser-Busch, LLC*, 567 S.W.3d 644, 652 (Mo. Ct. App. 2018); *Canales v. Univ. of Phoenix, Inc.*, 854 F.Supp.2d 119, 124 (D.Me.2012); *Zamora v. Swift Transp. Corp.*, 547 F. Supp. 2d 699, 703–04 (W.D. Tex. 2008).

As in all those cases, the Change Clause here makes the arbitration provisions illusory.

**V.    Conclusion**

Plaintiff respectfully requests that the Court deny the Motion.

Respectfully submitted,

/s/ Benjamin H. Carney
Benjamin H. Carney (Fed. Bar No. 27984)
Richard S. Gordon (Fed. Bar No. 06882)
GORDON, WOLF & CARNEY, Chtd.
Executive Plaza 1, Suite 1000
11350 McCormick Rd.
Hunt Valley, Maryland 21031
Tel. (410) 825-2300
Fax. (410) 825-0066
bcarney@GWCfirm.com
rgordon@GWCfirm.com

Attorneys for Plaintiff