

**CONSUMER FINANCIAL PROTECTION BUREAU STUDY FINDS THAT ARBITRATION AGREEMENTS LIMIT RELIEF FOR CONSUMERS**

The Consumer Financial Protection Bureau released a study indicating that arbitration agreements restrict consumers' relief for disputes with financial service providers by limiting class actions. The report found that, in the consumer finance markets studied, very few consumers individually seek relief through arbitration and the courts, while millions of consumers obtain relief each year through class action settlements.

**Arbitration Clauses by the Numbers**
Tens of millions of consumers are covered by arbitration clauses. The CFPB looked at arbitration clauses in six different consumer finance markets: credit cards, checking accounts, prepaid cards, payday loans, private student loans, and mobile wireless contracts.

- **53 percent:** The market share of **credit card** issuers that include arbitration clauses.
- **44 percent:** While fewer than 8 percent of banks and credit unions include arbitration clauses in their **checking account** agreements, those who do represent 44 percent of insured deposits.
- **92 percent:** The percentage of **prepaid card** agreements the CFPB obtained that are subject to arbitration clauses.
- **86 percent:** In the **private student loan** market, 86 percent of the largest lenders include arbitration clauses in their contracts.
- **99 percent**: The Bureau was able to obtain data on **payday loan** agreements in California and Texas. In those states, over 99 percent of storefront locations include arbitration clauses in their agreements.
- **88 percent:** Among **mobile wireless** providers who authorize third parties to charge consumers for services, 88 percent of the largest carriers include arbitration clauses. Those providers cover over 99 percent of the market.

**Overview**
Arbitration is a way to resolve disputes outside the court system. In recent years, many contracts for consumer financial products and services have included a "pre-dispute arbitration clause" stating that either party can require that disputes that may arise about that product or service be resolved through arbitration, rather than through the court system. Where such a clause exists, either side can generally block lawsuits, including class actions, from proceeding in court.

The Dodd-Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank Act) mandates that the CFPB conduct a study on the use of pre-dispute arbitration clauses in consumer financial markets. The Dodd-Frank Act also prohibits the use of arbitration clauses in mortgage contracts. And it gives the Bureau the power to issue regulations on the use of arbitration clauses in other consumer finance markets if the Bureau finds that doing so is in the public interest and for the protection of consumers, and if findings in such a rule are consistent with the results of the Bureau's study.

The Bureau first launched a [public inquiry](#) on arbitration clauses in April 2012 and released [preliminary research](#) in December 2013. Today's report uses a careful analysis of empirical evidence, including consumer contracts and court data, to understand the resolution of consumer finance disputes – both in arbitration and in the courts. The CFPB studied arbitration clauses in a number of different consumer finance markets that have the largest number of consumers, including credit cards and checking accounts.

**Report Findings**

Based on CFPB research into arbitration clauses in six different consumer finance markets, the report found that:

**Consumers filed roughly 600 arbitration cases and 1,200 individual federal lawsuits on average each year in the markets studied:** The CFPB's review of case data from the leading arbitration administrator indicates that between 2010 and 2012, across six different consumer finance markets, 1,847 arbitration disputes were filed. More than 20 percent of these cases may have been filed by companies, rather than consumers. During this same period, consumers filed 3,462 individual lawsuits in federal court about consumer finance disputes in five of these markets.

- **Many arbitration filings involved only a debt dispute:** Forty percent of the arbitration filings the CFPB studied involved only a dispute about the amount of debt the consumer owed the company – and no affirmative claims by the consumer regarding particular conduct by the company. In another 29 percent of cases, the consumer disputed the debt and also challenged conduct by the company.

- **Few cases involve small claims:** There were only on average about 8 cases per year involving a debt dispute of $1,000 or less and only about 25 cases per year involving an affirmative claim of $1,000 or less.

- **Some arbitration cases resulted in relief and debt forbearance for consumers:** In the 1,060 arbitration cases filed with the American Arbitration Association (AAA) in 2010 and 2011, 341 resulted in decisions by arbitrators. Consumers obtained relief from arbitrators on affirmative claims in 32 cases and obtained debt forbearance in 46 cases. The total amount of relief and debt forbearance consumers obtained in all of these cases combined was under $400,000. Companies obtained decisions requiring consumers to pay $2.8 million in cases filed during this same time period, predominantly for disputed debts.

- **Few consumer lawsuits went to trial:** Almost all the lawsuits the CFPB studied ended in a settlement or in a resolution consistent with a settlement, such as a withdrawal of claims. Only two individual cases went to trial. No class cases went to trial. In the sample of cases the Bureau analyzed, consumers obtained just under $1 million in damages in the few individual cases that were decided by judges.

**By contrast, on average, roughly 32 million consumers were eligible for relief through class action settlements in federal court each year:** Bureau research across consumer finance markets generally found that larger numbers of consumers are eligible for financial redress through class action settlements than through arbitration or individual lawsuits. At least 160 million class members were eligible for relief in federal consumer finance class actions over the five-year period studied. The settlements totaled $2.7 billion in cash, in-kind relief, expenses, and fees – with roughly 18 percent of

that going to attorneys' fees and expenses. Further, these figures do not include the potential value to consumers of companies changing their behavior. In the cases for which data was available, at least $1.1 billion was paid or scheduled to be paid to at least 34 million consumers.

- **An average of at least $220 million per year was paid out to consumers from these settlements**: The Bureau was able to obtain settlement payment data for more than 55 percent of the cases it studied, including all of the large cases. In over 100 of these settlements, payments were made to affected consumers automatically, without those consumers having to submit claims forms in order to receive relief. In those cases, over $700 million was paid to class members. The Bureau was able to obtain data on payments for roughly another 125 settlements in which consumers were required to make claims. In those cases, almost $325 million was paid to consumers according to documents the CFPB reviewed. In another roughly 25 settlements, some money was paid automatically and some in response to claims. In those cases over $60 million was paid through these combined methods. In other words, the total payout in these cases was at least $1.1 billion for an average of $220 million per year. Cash payments covered a minimum of 34 million consumers, or an average of 6.8 million consumers per year.

- **For checking accounts alone, class action settlements over three years totaled over $600 million for at least 19 million consumers:** In the checking account market, from 2010 to 2012 – the same years covered by the Bureau's review of arbitration cases and individual lawsuits – six class settlements were approved in a single proceeding involving the overdraft practices of a number of banks. Those six settlements totaled close to $600 million and covered over 19 million consumers. In contrast, there were a total of 72 arbitration disputes filed with the AAA involving checking accounts during this period and 137 individual cases filed in federal courts.

**Arbitration clauses can act as a barrier to class actions:** By design, arbitration clauses can be used to block class actions in court. The CFPB found that it is uncommon for a company to try to force an individual lawsuit into arbitration but common for arbitration clauses to be invoked to block class actions. For example, in cases where credit card issuers with an arbitration clause were sued in a class action, the companies invoked the arbitration clause to block class actions 65 percent of the time. Of the 1,200 individual lawsuits the CFPB examined that were filed between 2010 and 2012, companies invoked arbitration less than one percent of the time.

- **Most arbitration agreements prohibit class arbitrations:** Over 90 percent of the arbitration agreements the CFPB studied expressly prohibited class arbitrations. Those that did not have this express prohibition were from smaller companies that together represented 3 percent or less of their markets.

- **Class arbitrations were minimal:** Only two class arbitrations were filed with the AAA between 2010 and 2012. One was not pursued at all and the other had a motion to dismiss pending as of September 2014.

**No evidence of arbitration clauses leading to lower prices for consumers:** The CFPB looked at whether companies that include arbitration clauses in their contracts offer lower prices because they are not subject to class action lawsuits. The CFPB analyzed changes in the total cost of credit paid by consumers of some credit card companies that eliminated their arbitration clauses and of other companies that made no change in their use of arbitration provisions. The CFPB found no statistically significant

evidence that the companies that eliminated their arbitration clauses increased their prices or reduced access to credit relative to those that made no change in their use of arbitration clauses.

**Three out of four consumers surveyed did not know if they were subject to an arbitration clause:** The CFPB surveyed credit card consumers to analyze the extent to which they were aware of, and understood, arbitration agreements. Over three quarters of those who said they understood what arbitration is acknowledged they did not know whether their credit card agreement contained an arbitration clause. Of those who thought they did know, more than half were incorrect about whether their agreement actually contained an arbitration clause. Among consumers whose contract included an arbitration clause, fewer than 7 percent recognized that they could not sue their credit card issuer in court.

- **Consumers do not consider arbitration clauses while credit card shopping:** In selecting a credit card, consumers do not consider whether there is an arbitration clause. When asked to list all the factors they had considered in choosing their current credit card, not a single consumer mentioned arbitration or dispute resolution as factoring in the decision.

### 

*The Consumer Financial Protection Bureau is a 21st century agency that helps consumer finance markets work by making rules more effective, by consistently and fairly enforcing those rules, and by empowering consumers to take more control over their economic lives. For more information, visit consumerfinance.gov.*